James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

[Additional Attorneys On Signature Page]

*Attorneys for Plaintiff and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARIM P. NAJJAR, individually and behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> RIAD SALAMEH, BANQUE DU LIBAN, BANK OF BEIRUT, S.A.L., BANQUE LIBANO FRANCAISE, S.A.L., BLOM BANK, S.A.L., BYBLOS BANK, S.A.L., FRANSABANK, S.A.L., SOCIETE GENERALE DE BANQUE AU LIBAN, S.A.L., BDO USA, P.C., DELOITTE, LLP, DELOITTE & TOUCHE, LLP, and ERNST & YOUNG U.S. LLP, <br><br> Defendants. | Civil Action No. |

## CLASS ACTION COMPLAINT

Plaintiff Karim P. Najjar ("Plaintiff") by his attorneys, individually and on behalf of a class

of similarly situated persons, alleges the following against Riad Salameh, Banque Du Liban, Bank

of Beirut, S.A.L., Banque Libano Francaise, S.A.L. , Blom Bank, S.A.L., Byblos Bank, S.A.L.,

Fransabank, S.A.L., Societe Generale De Banque Au Liban, S.A.L., BDO USA, P.C., Deloitte, LLP, Deloitte & Touche, LLP, and Ernst & Young U.S. LLP (together, "Defendants"):

## INTRODUCTION

1.      Lebanon is a country in the Levantine region of West Asia, bordered by Syria, Israel and the Mediterranean Sea.  It is a founding member of the United Nations and is one of only two democratic countries in the Middle East.  Its Government is organized in a unique way designed to give each of its 18 primary ethnic and religious groups a say in the Government.

2.      Lebanon's location as a crossroads in the region has contributed to its rich artistic and cultural history. It has a population of over five million people and is the most religiously diverse country in the Middle East.  Its largest city - Beirut - was once known as the Paris of the Middle East.  The earliest evidence of human life in Lebanon date to 5000 B.C.

3.      Lebanon's strategic location has unfortunately led to a history of unrest and conquest. The Romans conquered Lebanon in 64 BC and after World War I it was a French protectorate.  Lebanon gained independence from France in 1943 and enjoyed a relative period of stability and economic prosperity thereafter. During this period of prosperity, Lebanon's banks were a beacon of stability.

4.      Lebanon's recent history is turbulent. In 1975, a sectarian Civil War occurred. Lebanon was partially occupied by Syria from 1976 to 2005 and partially occupied by Israel from 1985 to 2000.  These occupations and conflict led to a huge diaspora from Lebanon with over 1,800,000 Lebanese leaving the country.  This diaspora was one of the primary targets of the scheme perpetrated by the defendants named in this complaint.

5.      After the Israeli and Syrian occupations, there was an extensive internal and external effort to rebuild the Lebanese economy, and its devastated infrastructure.  One of these

efforts to rebuild and promote financial stability involved pegging the value of the Lebanese currency ("LBP" or the "Pound" or the "Lira") to the US dollar ("USD" or "Dollar") at a rate of LBP 1,507.5 to $1 in 1997.

6.      In order to maintain this currency peg and fund a growing public debt, Lebanon's economy was highly dependent on the inflow of foreign currency, including to a large degree remittances from the Lebanese diaspora.  Without continued and significant foreign remittances, imports of food, medicine, and other necessities would be greatly hindered and the Lebanese economy would not be sustainable.

7.      However, beginning in 2015 Lebanon's foreign remittances and dollar liquidity decreased for the first time since the lira-to-dollar pegging, resulting in a soaring budget deficit.

8.      Lebanese banks, including Defendants, began offering remarkably high interest rates starting in or around 2016 in an effort to reverse increase the dwindling remittances and restore their dollar reserves.  For example, at a time of continued historically low interest rates in 2016, the rate of a 1 year CD in the United States was typically less than .25%, while Lebanese banks were offering more than 5.5% return on dollar deposits.  But these rates were an illusion - part of a scheme which resulted in the enrichment of bank insiders and the defrauding of millions of bank depositors.

9.      Predictably, like all such schemes, this one eventually collapsed - leaving Plaintiff and the Class without access to billions of dollars of deposits made into the defendant banks.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts causes of action pursuant to 18 U.S.C. § 1962, such that this action arises under the laws of the United States.

11.     The Court has subject matter of this action, a putative class action against foreign persons, under 28 U.S.C. §§ 1332(a)(2) and (d)(2)

12.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1330(a), because Defendant Banque du Liban ("BDL") is a foreign state within the meaning of 28 U.S.C. § 1603(a) and (b), and BDL is not entitled to sovereign immunity in this action, including pursuant to 28 U.S.C. § 1605(a).

13.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental subject matter jurisdiction over all other claims not arising under the laws of the United States. Venue is appropriate in this district, as the plaintiff resides in this district, the defendant transacts business in this district, and the cause of action arises from transactions entered into (at least in part) in this district and performed entirely in this district.

14.     This action arises out of business transacted by Defendants and their many co-conspirators in New Jersey and in the United States. *This is the first case of its kind to allege a single conspiracy, in violation of federal RICO and state common law of conspiracy, directed by BDL and including a large consortium of Lebanese commercial banks* (the "Commercial Bank Conspirators"), who were specifically directed, and incented, by BDL to increase their dollar-denominated deposits, which they did. It is based on the centrally orchestrated "financial engineering" scheme orchestrated by BDL, which is described in a 2023 audit report of BDL issued by an accounting firm retained by Lebanon's Ministry of Finance. U.S-based depositors were the targets of this conspiracy, which was focused on extracting dollars from the United States. All of the jurisdictional contacts of each member of the conspiracy are imputed to the other members of the conspiracy.

15.     The Commercial Bank Conspirators systematically defrauded American

depositors, principally Americans with Lebanese roots, in New Jersey and in other states as they desperately needed to obtain, and retain, deposits of sought-after US dollars. as the other Commercial Bank Conspirators targeted residents of the United States, and New Jersey specifically, and successfully solicited other depositors in New Jersey and elsewhere in the United States. New Jersey has the seventh largest (numerically) population of Arab-Americans, and the third largest (after Michigan and Massachusetts) concentration (as a percentage of the overall population) of Arab-Americans, of any U.S. state. Defendants and their co-conspirators could not have plausible undertaken this conspiracy without targeting New Jersey.

16. This action arises out of business transacted by Defendants and their many co-conspirators in New Jersey and in the United States, and venue is proper under 28 U.S.C. § 1391 and 18 U.S.C. §§ 1965(a) and (b).

## **THE PARTIES**

17. Plaintiff Karim P. Najjar ("Dr. Najjar" or "Plaintiff") is a resident of Moorestown, New Jersey. Dr. Najjar is a pediatrician with offices in Moorestown, New Jersey. Dr. Najjar is a depositor with Byblos, defined below.

18. Defendant BDL is the central bank of Lebanon. BDL is a legal public entity established by the Lebanese Code of Money and Credit promulgated on August 1, 1963, by Decree No. 13513. BDL's operations as the central bank of Lebanon commenced April 1, 1964. BDL is headquartered at Masraf Lubnan Street, 1100-5544, Beirut, Lebanon. BDL is a citizen of Lebanon.

19. Defendant Riad Salameh was the Governor of BDL from approximately 1993 to July 2023. Defendant Salameh is a resident of Lebanon.

20. Bank of Beirut, S.A.L. ("Bank of Beirut") is a banking entity with a principal place of business located in the country of Lebanon.

21.     Defendant Banque Libano Francaise, S.A.L. ("BLF") is a banking entity with a principal place of business located in the country of Lebanon.

22.     Defendant Blom Bank, S.A.L. ("Blom") is a banking entity with a principal place of business located in the Country of Lebanon.

23.     Defendant Byblos Bank, S.A.L. ("Byblos") is a banking entity with a principal place of business located in the country of Lebanon.

24.     Defendant Fransabank, S.A.L. ("Fransabank") is a banking entity with a principal place of business located in the country of Lebanon.

25.     Defendant Societe Generale de Banque au Liban, S.A.L. ("SGBL") is a banking entity with a principal place of business located in the Country of Lebanon.

26.     Defendants Bank of Beirut, BLF, Blom, Byblos, Fransabank and SGBL are hereinafter collectively referred to as the "Commercial Bank Defendants." The Commercial Bank Defendants are six Lebanese commercial banks with substantial foreign currency deposits (principally Dollars) held at BDL between 2015 and 2020. The Commercial Bank Defendants could not plausibly have amassed that quantity of Dollars without systematically targeting depositors in New Jersey and elsewhere in the United States. Each Commercial Bank Defendant, upon information and belief, has depositors on record in New Jersey and elsewhere in the United States, and jurisdictional discovery will confirm that fact.

27.     Defendant BDO USA, P.C. ("BDO USA") is a Virginia corporation with its principal place of business in Chicago, Illinois. BDO USA is the United States member firm of BDO International ("BDO"), a global accounting network. Notwithstanding its formation of many subsidiaries around the world, BDO operates, effectively, as a single entity, and touts its international integration and ability to provide professional services in all corners of the globe.

BDO's Lebanon affiliate was one of the two accounting firms to audit Byblos' financial statements.

28.     Defendant Deloitte, LLP and Deloitte & Touche, LLP (collectively "Deloitte USA") are Delaware limited liability partnerships with their principal place of business in New York, New York. Deloitte USA is the United States member firm of the multinational consortium of professional services firms known as "Deloitte," one of the largest professional services networks of its kind in the world. Deloitte operates, effectively, as a single entity, and touts its international integration and ability to provide professional services in all corners of the globe. Deloitte's Lebanon affiliate was one of the two accounting firms to audit BDL's financial statements.

29.     Defendant Ernst & Young U.S. LLP ("EY USA") is a Delaware limited liability partnership with its principal place of business in New York, New York. EY USA is the United States member firm of the multinational consortium of professional services firms known as "EY," one of the largest professional services networks of its kind in the world. EY operates, effectively, as a single entity, and touts its international integration and ability to provide professional services in all corners of the globe. EY's Lebanon affiliate was (1) one of the two accounting firms to audit BDL's financial statements and (2) one of the two accounting firms to audit Byblos' financial statements.

30.     Defendants BDO USA and EY USA are collectively referred to as the "Byblos Accounting Defendants."

31.     Defendants Deloitte USA and EY USA are collectively referred to as the "BDL Accounting Defendants."

32.     Non-party co-conspirators (the "Non-Party Conspirator Banks") of the

Commercial Bank Defendants and BDL include, but are not necessarily limited to: Al Baraka Bank, S.A.L., AM Bank, S.A.L., Arab Bank PLC, BLC Bank, S.A.L., Bank Audi, S.A.L., Bank BEMO, S.A.L., Bankmed, S.A.L., Banque Misr Liban, S.A.L., BBAC, S.A.L., BSL Bank, S.A.L., Cedrus Bank, S.A.L., Credit Libanais, S.A.L., Credit Bank, S.A.L., Emirates Lebanon Bank, S.A.L., Fenicia Bank, S.A.L., First National Bank, S.A.L., IBL Bank, S.A.L., Lebanese Swiss Bank, S.A.L., LGB Bank, S.A.L., MEAB, S.A.L, North Africa Commercial Bank, S.A.L., and Saradar Bank, S.A.L. The Non-Party Conspirator Banks are commercial banks in Lebanon which were among the perpetrators of the illegal scheme BDL designed. The Commercial Bank Defendants and the Non-Party Conspirator Banks are referred to collectively as the "Commercial Bank Conspirators."

### BDL'S FRAUDULENT SCHEME TO ACCUMULATE DOLLARS

33. BDL is the central bank of Lebanon and the architect of the scheme. In the 1990s, as Lebanon emerged from its devastating fifteen-year civil war, a dual currency system formed with the USD and the Pound both being used widely. The two currencies were not pegged, however, causing massive swings in the exchange rate and chaos in the Lebanese economy.

34. In an attempt to solve the problem, the then BDL Governor, Defendant Salameh, engineered the pegging of the exchange rate at LBP 1507.51515 to $1. To support the artificial pegging of the exchange rate, BDL and the Lebanese government sought to encourage foreign currency investment, particularly USD, which ultimately became the dominant deposit currency in Lebanon.

35. Starting in the 1990s, Lebanese banks lured investments of USD with high interest rates, strong correspondent banking relationships in New York, and sophisticated banking services.

36.     The shareholders and executives of the Commercial Bank Conspirators, many of whom served in high levels of the government, portrayed the banking system as strong and flourishing, and they received rich distributions and salaries.

37.     In reality, the interest rates were unsustainable, and placed the Commercial Bank Conspirators in jeopardy once new deposits ebbed and depositors sought to remove their USD from the Commercial Bank Conspirators.

38.     BDL was also vulnerable as a result of the strain on the Commercial Bank Conspirators which deposit USD with BDL to provide it with liquidity.

39.     By early 2015, Lebanese banks began recognizing depleting USD deposits, which strained the system as the banks' interest obligations increased.

40.     BDL and the Commercial Bank Conspirators needed to adjust their business model, which would have revealed the false premise on which BDL engineered the banking system and the shareholders and executives of the Commercial Bank Conspirators would have no longer been able to enrich themselves to same extent.

41.     The Lebanese commercial banking sector was clearly aware of the impending crisis because Commercial Bank Conspirators were one of its main architects. Beginning in 2016, the Lebanese Central Bank began offering the Commercial Bank Conspirators lavish returns on any fresh U.S. dollars that they could bring in from their clients, a process known as "financial engineering," to resolved dwindling confidence in the Lebanese economy in the years beforehand.[1] The Commercial Bank Conspirators attracted new U.S. dollars by offering exorbitant and unsustainable high interest rates to depositors, despite knowing that they would have to

---

[1] https://www.thinktriangle.net/wp-content/uploads/2019/11/Extend_Pretend_Lebanons_Financial_House_of_Cards_2019.pdf p.7

fraudulently induce new depositors to pay back such high interest rates and keep their scheme propped up.[2]

42.　　Specifically, Lebanese commercial bank personnel targeted U.S. citizens to solicit new deposits while the potential depositors were in the United States. The Commercial Bank Conspirators used mediums such as WhatsApp call and messaging, email, and phone conversations to solicit depositors.

43.　　Because BDL and the Commercial Bank Conspirators were intent on keeping a curtain over the growing problem so they could continue to enrich themselves notwithstanding the unsustainability of their policies, they did not alter their business model.

44.　　Instead, BDL and the Commercial Bank Conspirators agreed that they would engage in an illegal scheme to cover up and delay the self-created and looming crisis, all so that they could cover up their failed policies and continue enriching themselves.

45.　　BDL and the Commercial Bank Conspirators, including Defendant Byblos and other banks, agreed they would offer even higher interests to lure new deposits and to induce depositors to retain their deposits in Lebanon, knowing the banks could never sustain the interest payments. BDL and the Commercial Bank Conspirators agreed they would project strength and health for the Lebanese banking system they knew was facing an imminent liquidity crisis.

46.　　The conspirators agreed to specifically target people of Lebanese descent living abroad, particularly United States citizens and residents.

47.　　As a result of BDL's "financial engineering" scheme, the amount of dollar deposits with the Bank Conspirators ballooned between 2015 and 2019. Foreign currency deposits at BDL increased by 119% from the end of 2015 and the end of 2020.

---

[2] https://internationalbanker.com/finance/what-is-behind-lebanons-deepening-financial-crisis/

48.     At the same time, the assets held by BDL deteriorated dramatically.  Foreign currency assets held outside of Lebanon fell dramatically -- from $35.8bn in 2015 to $18.4bn in 2020.

49.     Locally held foreign currency assets increased from $12.7bn in 2015 to $21.2bn in 2020. But these "locally held" assets consist "primarily amounts owed to BDL from the state," as to which A&M concluded "there is considerable uncertainty as to its recoverability" (a vast understatement).

50.     BDL moved from a foreign currency surplus of $7.2bn at the end of 2015 to a shortage of $50.7bn at the end of 2020. But the reality is worse than that. If locally held assets (which are largely worthless) are excluded, "the shortage in foreign currency reserves as at 31 December 2020 increases to USO 71.9bn. Given GDP in 2020 of USO 31.2bn, this equates to 230% of GDP."

51.     BDL and the Commercial Bank Conspirators are zombies. They would all be in receivership if they were operating in the United States.  They collectively solicited huge volumes of dollar deposits, and then those dollars went through BDL and left the country.

52.     What happened at Byblos was what happened at BDL in a microcosm. At the end of 2015, Byblos's balances held at BDL were a mere LBP 6.7tn. By the end of 2016, the balance was LBP 8.2tn.    By the end of 2017, Byblos balances with BDL grew to LBP 11.3 tn.  By the end of 2018, this figure had ballooned to LBP 15.5 tn. This was, by far, the largest asset on Byblos' balance sheet. By that time, the viability of Byblos rested on an IOU from BDL.

53.     The Byblos Accounting Defendants did not ask questions, and signed off on Byblos's financials for the years ending 2015-18 inclusive. For 2017 and 2018, in particular, the radical increase in the amounts due from BDL should have constituted a monumental red flag. The

Commercial Bank Conspirators were collecting very real dollars, and sending them to the BDL, in exchange for a mere "IOU" of questionable value. The Accounting Defendants had a duty to examine whether this asset on the books of Byblos – which was *the gorilla asset* held by Byblos – was actually collectible. The Accounting Defendants were woefully negligent in performing their responsibilities as auditors of Byblos. They knew or should have known that the Lebanese banking system had become a house of cards at least by 2018. Defendant EY, in particular, which also audited BDL itself, was particularly aware of this fact, as it had refused to sign off on BDL's 2018 financials without qualification, but did so anyway for Byblos. The Byblos Accounting Defendants provided substantial assistance to Byblos in its fraudulent scheme to inflate its own financials, and Byblos' participation in BDL's fraudulent scheme to entice depositors to deposit dollars with Byblos and the other Commercial Bank Conspirators.

54. BDL and the Commercial Bank Conspirators agreed to use illegal means to carry out their conspiracy, including by making fraudulent misrepresentations and theft, all so the BDL executives and the shareholders and executives could further enrich themselves at the expense of their victims, which included depositors, borrowers and Lebanon.

55. The Commercial Bank Conspirators used the Lebanon Association of Banks to coordinate their scheme with each other and BDL and to communicate instructions for carrying out the scheme. The Association of Banks may have once been a legitimate organization of the chief executives of the commercial banks in Lebanon, but the Commercial Bank Conspirators and BDL started to use it as an instrumentality of their unlawful scheme.

56. In furtherance of their scheme, Lebanese banks began offering extremely high interest rates to attract USD depositors both within Lebanon and abroad to feed the failing system and further their scheme. Upon inducing depositors to deposit their USD in Lebanon, depositors

were then induced to convert the USD into Lebanese Lira, in return for which the depositors were promised even higher (and even more unsustainable) interest rates.

57.     As the Lebanese banks and BDL planned, and as the depositors would soon learn, the Lira was about to become highly devalued, and nearly worthless.

58.     Once the depositors converted their USD to Lira, they were left with no alternative other than a complete devaluation of the Lebanese Lira and to completely erase any of the remaining value held by these depositors.  While BDL advertises an "official" exchange rate of approximately 1,507 Lira to $1 USD, the true exchange rate has been fluctuating between 7,000 to 10,000 Lira to $1 USD.

59.     While the Commercial Bank Conspirators and those benefiting from their association with, and employment by, these banks) were able to continue to hoard valuable USD, depositors who exchanged their USD into Lira were left with an almost worthless local Lebanese currency.

60.     The depositors' USD cannot be withdrawn or collected outside of Lebanon (nor can it be withdrawn or collected within Lebanon).

61.     The end result for victims of this enterprise is that, while BDL and the Commercial Bank Conspirators continue to hold USD in deposit within the Lebanese banking system, the victims have no way to access their hard-earned USD anywhere in the world.

62.     BDL and the Commercial Bank Conspirators knew that the payment of the inflated interest rates was unsustainable, and when the flood of new USD deposits waned, the Lebanese banking system collapsed.

63.     The conspirators' scheme engineered the theft of tens of billions of dollars from over two and a half million people, including thousands of United States citizens and residents.

64. When the Lebanese banks could not induce sufficient new deposits to pay their obligations, the banks hoarded the USD deposits of many of their depositors by lying to induce customers to retain their deposits. Ultimately, the banks refused lawful withdrawal requests from their depositors. At the same time, the Lebanese banks discriminatorily permitted politically connected depositors, bank executives, bank shareholders, and their relatives to offshore their USD, which of course only exacerbated the self-inflicted liquidity crisis. Defendants' scheme had collapsed, and BDL and the Lebanese banks resorted to outright theft of their depositors' USD.

65. By mid-2019, the Lebanese banks were actively colluding with BDL and using the Association of Banks to institute unlawful, draconian, and discriminatory capital controls and restrictions on withdrawals of USD and transfers of USD outside Lebanon.

66. Lebanon's banking crisis has driven the Lebanese banking system to place its own USD hoarding above the rule of law in flagrant violation of the rights of depositors like Plaintiff and members of the Class.

67. At the same time, Lebanese politicians, bank shareholders, executives, owners, and board members (many of whom are parliament members and former ministers of Lebanon's government), bank employees, and other influential people and companies were permitted by BDL and the Lebanese banks to safely offshore their USD. This self-destructive corruption exacerbated the liquidity crisis in the Lebanese banking system, and is the subject of ongoing investigations and political unrest within Lebanon. Thus, in addition to operating a scheme to defraud depositors, BDL and the Commercial Bank Conspirators were running a money laundering operation.

68. In the fall of 2019, Lebanon's liquidity crisis worsened, following  years of financial mismanagement and corruption within the banking sector. The Commercial Bank Conspirators began restricting depositor access to their U.S. dollars. Since then, when depositors

have requested to transfer their funds to foreign accounts, the banks have refused, unlawfully converting up to millions of dollars of depositor funds, including those of U.S. citizens.

69.     In October 2019, the Lebanese public engaged in mass demonstrations to protest political leaders' systemic mismanagement of the country resulting in poor social and economic conditions.[3] In response to these protests, commercial banks closed for an unprecedented two weeks.[4] Once the banks reopened, they unlawfully restricted depositor access to their U.S. dollars and blocked bank transfers to outside of the country.[5] Since October 2019, Lebanese depositors, including U.S. citizens, have had millions of dollars of their funds illegally converted by their banks.

70.     The Lebanese commercial banking sector was aware of the impending liquidity crisis; high-ranking banking officials and politicians began moving large swaths of personal funds outside of Lebanon in the years and months leading up to October 2019.[6] Yet Commercial Bank Conspirators neglected to inform their depositors of the risk to their funds, including their U.S. citizen depositors. Instead, the banking sector continued to incentivize customers and potential customers to deposit new funds into their accounts, and falsely represented to all depositors that their money was safe and recoverable.[7]

## PLAINTIFF'S TRANSACTIONS WITH BYBLOS

71.     Plaintiff opened an account with Byblos in or around 1996. Plaintiff resided in

---

[3] https://www.washingtoninstitute.org/policy-analysis/legacy-lebanons-october-revolution
[4] https://www.aljazeera.com/economy/2019/11/1/lebanons-banks-reopen-after-two-week-closure
[5] https://www.reuters.com/article/us-lebanon-protests-banks-idUSKBN1Y027S/
[6] https://today.lorientlejour.com/article/1298108/the-multi-billion-dollar-question-tracing-lebanons-growing-offshore-wealth-amid-financial-collapse.html
[7]https://www.reuters.com/article/idUSKCN1U625G/#:~:text=Lebanese%20banks%20are%20drawing%20fresh%20dollars%20to%20the,central%20bank%20reserves%20that%20have%20been%20in%20decline.

Pennsylvania at that time, and has resided in New Jersey since approximately 2001. Plaintiff was a resident of the United States at all times during his banking relationship with Byblos.

72.     Plaintiff deposited approximately $100,000 when opening his initial account with Byblos, which has always been denominated in US dollars.

73.     Plaintiff's principal point of contact was, at most times until at least 2019, Mohamad Salam, the manager of the Hamra branch (in Beirut, Lebanon) of Byblos Bank. A second point of contact was Mr. Carlos Hawi, a more junior employee assigned to Plaintiff's accounts.

74.     Plaintiff came to deposit an additional (approximately) $500,000 of principal in or around 2010, and an additional (approximately) $100,000 in or around 2014. These two additional deposits were into an account denominated (at the time) in Lira.

75.     Between 2016 and 2019, Plaintiff inquired from Mr. Salam on many occasions about withdrawing his deposits. Each time, Mr. Salam offered to raise the interest rates on the accounts if Plaintiff would agree not to withdraw his deposits.

76.     In or around October 2019, Plaintiff called Mr. Hawi to inquire about withdrawing his deposits. Plaintiff told Mr. Hawi "I heard that people's money is blocked, what's going on?" Mr. Hawi responded that "well you can't [withdraw your deposits] right now."

77.     In or around October 2019, Plaintiff requested from Mr. Salam to withdraw his deposits. Mr. Salam responded that it was not possible. Plaintiff made additional such requests of Mr. Salam over the remainder of 2019, and in the first few months of 2020. On each occasion, Mr. Salam informed Plaintiff that he could not withdraw any portion of his deposits.

78.     Plaintiff presently holds three accounts with Byblos:

> (1)     An account denominated in U.S. dollars with a stated account balance of
>         approximately $281,513.

(2) A second account also denominated in US dollars with a stated balance of approximately $754,838. The account bore interest at 10% at peak, which Byblos promised, but is now paying no interest.

(3) A third account was denominated in Lira, into which interest on the other two accounts was deposited. The balance is presently approximately $34,278.

79. None of the accounts presently pay any interest. None of the deposits are accessible to Plaintiff, and Byblos has given him no indication of when, or ever, they will be accessible to him.

80. Starting with misconduct that began in 1996 and continues to this day, Byblos victimized Plaintiff of more than $1m USD in principal and accrued interest from Plaintiff's accounts in Lebanon. In addition, under both applicable state and federal law and as described below, Plaintiff is entitled to treble damages, attorneys' fees and costs, as well as prejudgment interest.

81. The Commercial Bank Conspirators targeted and solicited American depositors, principally targeting Lebanese Americans like Dr. Najjar, to make USD deposits.

82. Lebanese banks, including the Commercial Bank Conspirators, were offering interest rates in the high teens to depositors willing to make longer-term deposits for several months or years, and with relatively high rates of approximately 10%, to depositors with shorter terms of maturity.

83. Defendants had collusively agreed to violate the rights of USD depositors by preventing the depositors from withdrawing their USD or transferring their USD outside Lebanon..

84. The Commercial Bank Conspirators, including Byblos, promised Plaintiff and other depositors high interest rates on Plaintiff's and the Class's USD deposits to induce Plaintiff and other depositors to make deposits, and to refrain from making withdrawals, even though the

banks knew their scheme was unsustainable.

85.     To amass USD deposits and to effectuate USD transactions, including for Plaintiff, Byblos and the other Commercial Bank Conspirators all maintain correspondent bank accounts in New York at large United States banks.

86.     As the Lebanese banks had no grounds for refusing depositors' instructions to transfer USD outside Lebanon, BDL and the banks entered into a conspiracy in which they agreed to make fraudulent misrepresentations to Plaintiff and the Class, some of the Commercial Bank Conspirators issued worthless checks to depositors in the United States that Defendants had no intention of honoring.

87.     Defendants and the other Commercial Bank Conspirators pervasively used the wires and mails to carry out their fraudulent scheme to steal from Plaintiff and the Class.

88.     Plaintiff and other Class members suffered substantial injury in the United States as a result of Defendants' unlawful activity and corrupt conspiracy, including the loss of their USD on deposit with the Commercial Bank Conspirators.

## THE AFTERMATH

89.     In their audits for the year ending December 31, 2019, and for the years ending December 31, 2020, December 31, 2021, and December 31, 2022, the Byblos Accounting Defendants, belatedly, issued an "adverse opinion" noting that they could not concur with the financial statements issued by Byblos. For 2019, in a report that was not issued until June 30, 2020, for example, the Byblos Accounting Defendants noted that it was questionable whether Byblos' balances held with BDL were really worth the amount stated on Byblos' balance sheet and that adjustments needed to be made to the carrying amount of these assets:

> As disclosed in Note 49.2 to the consolidated financial statements, the Group holds assets with the Central Bank of Lebanon, a portfolio of Lebanese government debt

securities, a portfolio of loans to the private sector and other assets concentrated in Lebanon. As disclosed in Note 1, the accompanying consolidated financial statements do not include IFRS 9 adjustments to the carrying amounts of these assets and related disclosures that would result from the resolution of the uncertainties disclosed therein and the future effects of the economic crisis and the restructuring plan. In addition, as disclosed in Note 48, these consolidated financial statements do not include IFRS 13 fair value disclosures for these financial assets and other financial instruments concentrated in Lebanon. Had such adjustments and disclosures been made, many elements and related disclosures in the accompanying consolidated financial statements would have been materially affected. The effects on these consolidated financial statements have not been determined.

90. But it was too little too late. The horse had already left the barn, the barn was on fire, and the collapse of the Lebanese financial system had become public knowledge a months before the 2019 financial statements were released (in early 2020). The Byblos Accounting Defendants should have issued adverse opinions for 2017 and 2018, too, but failed to do so. They had a responsibility to proactively examine, with their full access to Byblos' books and records, the collectability of this rather conspicuous gorilla asset on Byblos' balance sheet, and not to wait for media reports to issue an adverse opinion.

91. On June 4th, 2020, a man identified as Antoine Dagher, Group Ethics and Fraud Risk Manager at Byblos, was found dead in the parking garage of his own home in Hazmieh, Lebanon. He was hit in the head with a sharp tool that fractured his skull. Dagher, who was in his 60s, died instantly. Somebody did not want his knowledge to become public.

92. In or around June 2020, the BDL Accounting Defendants finally released their financial statements for 2018, over a year after that task would be customarily completed. They should have done so in early 2019. The 2018 financials were issued with "qualifications" from BDL's accountants (Defendant EY and the Deloitte firm). The 2018 report shows a number of methods used to inflate assets and minimize liabilities of BDL. First and foremost, BDL Recorded as an asset a LBP 10.27 tn ($6.82bn) asset described as "seigniorage on financial stability,"

representing the difference between the cost of printing new money and its face value. Seigniorage is usually listed by central banks as an income stream, not an asset. As well as the unorthodox seigniorage accounting, the central bank also booked questionable supposed profits on lending to the government. Deloitte and EY also said the central bank used an accounting and financial reporting framework adopted by its own council, rather than International Financial Reporting Standards (IFRS). The exceptions noted by the BDL Accounting Defendants were too little too late. BDL was a disaster, and had been for years. BDL had issued years of fraudulently inflated financials, and the BDL Accounting Defendants bear responsibility for allowing BDL to continue to orchestrate a fraudulent scheme to suck Dollars into Lebanon for the benefit of insiders such as Defendant Salameh.

93.     In February 2023, Lebanese authorities charged Defendant Salameh, his brother Raja and one of his assistants with money laundering, embezzlement and illicit enrichment. The charges were the product of an 18-month probe by Lebanon into whether Defendant Salameh and his brother Raja embezzled more than $300 million from the BDL between 2002 and 2015. The Salameh brothers are alleged to have transferred $330 million to Swiss accounts via the offshore company Forry Associates, which is registered in the British Virgin Islands,

94.     The Swiss Financial Market Supervisory Authority (FINMA) announced in 2023 that it was investigating 12 Lebanese banks. It has brought enforcement proceedings against two of them that had Swiss affiliates within the scope of their regulatory jurisdiction, Banque Audi (Suisse) SA, and BankMed (Suisse) SA.

95.     Under an engagement letter dated August 24, 2021, Alvarez & Marsal Middle East Limited ("A&M") was engaged by the Republic of Lebanon as represented by its Ministry of Finance to perform a forensic audit and a governance and controls assessment of BDL. On or about

August 8, 2023, less than one year ago, A&M released its "Preliminary Forensic Audit Report" ("A&M Report") a document well in excess of 300 pages, summarizing its findings to date.

96.     BDL did not cooperate with the audit, attempting to further conceal what transpired. A&M noted that BDL did not permit A&M to perform its audit on-site nor to interview any BDL employees, and failed to provide many requested categories of documents.

97.     A&M reported that, starting in 2015, BDL centrally orchestrated a campaign of "financial engineering" to incent the other Commercial Bank Conspirators to solicit and maintain deposits of US dollars. BDL would obtain badly needed dollars by acquiring Lebanese treasury bonds from the Commercial Bank Conspirators at a premium, in exchange for the Commercial Bank Conspirators investing dollars in Eurobonds issued by BDL. A&M concluded that this program was poorly conceived and the risks associated with it largely overlooked. BDL's directive resulted in " a 119% increase in foreign-currency denominated deposits, fueled by the BDL's financial engineering programs, while foreign-currency denominated assets fell by 18%." At Byblos, for example, dollar-denominated deposits rose LBP 5.2 tn to LBP 13.9 tn between 2015 and 2020. This was very much a house of cards – as Byblos and the other Commercial Bank Conspirators had increasingly large nominal dollar deposits, but fewer actual dollars. A&M reported that, if domestic assets (which were of questionable, if any, value) are disregarded, "the shortage in foreign currency reserves as at 31 December 2020 increases to [$]71.9bn," which "[g]iven GDP in 2020 of [$]31.2bn,7 this equates to 230% of GDP."

98.     A&M further concluded that BDL's financial statements from 2015-2020 were inaccurate. BDL's financial statements, A&M concluded, "were prepared using unconventional accounting policies" which "allowed BdL to overstate assets, equity and profits while understating liabilities - and to close each year-end in amounts specified by the Governor without explanation

for the amounts chosen." A&M further concluded that BDL completely lacked internal controls or any  meaningful internal audit function. A&M further noted that there were no meaningful discussions, much less dissenting views presented, at board meetings, as the Governor's proposals were simply rubber stamped. The BDL Accounting Defendants completely failed to apply applicable accounting principles in their annual audits of BDL's financials. The BDL Accounting Defendants were negligent in performing their responsibilities. They knew that BDL was engaged in fraud, and provided substantial assistance to BDL in its fraudulent course of conduct.

99.     Even if Plaintiff and the Class had begun, in late 2019, investigating the causes of the Lebanese financial crisis and its effects on Byblos and the other Commercial Bank Conspirators, they could not have plausibly discovered, until the A&M Report was issued in 2023, that BDL had centrally orchestrated a fraudulent scheme to suck dollars into Lebanon. In fact, none of the information described in this subsection of the complaint became publicly known until (at the earliest) June 2020.

100.    In March 2024, FINMA announced that Audi Suisse had violated money laundering rules, including financial reporting regulations, and sanctioned 22.9m CHF in disgorgement and risk surcharge.

101.    British courts have entered judgments directing Lebanese banks to transfer to the UK the deposits made by certain of their UK-based depositors who brought suit in UK courts.

102.    On or about April 8, 2024, just days before this Complaint was filed, another Byblos official was murdered. Pascal Sleiman, Head of Management Information Systems at Byblos, was found dead in Syria after having been kidnapped in the Lebanese village of Hakel, in the Jbeil region, north of Beirut.

## CLASS ALLEGATIONS

103. Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on its own behalf and on behalf of all others similarly situated, as representative of the following proposed Class and Subclass (together, the "Classes"):

> All persons residing in the United States holding balances with one or more of the Commercial Bank Conspirators at any time on or after August 1, 2019. This includes a first subclass (the "Subclass") of persons residing in the United States holding balances with one or more of the six Commercial Bank Defendants at any time on or after August 1, 2019. This includes a second Subclass (the "Byblos Subclass," a subset of the Subclass) of persons residing in the United States holding balances with Byblos at any time on or after August 1, 2019.

104. The records of the Commercial Bank Conspirators will render the members of the Classes readily identifiable.

105. There are questions of law and of fact common to all members of the Classes as described below.

106. Plaintiff's claims are typical of those of the Classes as all members of the Classes have lost the total value of all funds deposited with the Commercial Bank Conspirators. Plaintiff's claims and those of the Classes are based on identical legal theories concerning Defendants' conduct, which was common as to all members of the Classes. Plaintiff and the members of the Classes seek damages for the same sort of injuries caused by Defendants' conduct.

107. Plaintiff and its counsel will fairly and adequately represent the interests of the members of the Classes. Plaintiff has no interest antagonistic to, or in conflict with, the interests of the members of the Classes. Plaintiff's counsel are highly experienced in the prosecution of class actions and complex litigation. Plaintiff's counsel have the financial resources necessary to adequately and vigorously litigate this class action.

108.     A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiff and the members of the Classes. Plaintiff and the members of the Classes have been harmed in identical ways by Defendants' conduct. Although the members of the Classes have each suffered extensive damages, these damages are still likely smaller than the expense and complexity of litigating on an individual basis against the numerous Defendants involved in the Lebanese Banking Enterprise. Therefore, it is unlikely than any individual Class Member would be able to obtain effective redress for the wrongs committed against that person by these Defendants.

109.     Common questions of law and fact predominate over individual questions. These questions include:

(a)     whether  BDL and the Commercial Bank Conspirators engage in a common plan to entice foreign depositors to deposit dollars in the Commercial Bank Conspirators;

(b)     whether BDL and the Commercial Bank Conspirators misrepresent their financial condition and the prospects of depositors' deposits with the Commercial Bank Conspirators; and

(c)     whether the Commercial Bank Conspirators and BDL prohibit US depositors from withdrawing their deposits.

112.     In the alternative, this Court should certify an issues class under Rule 23(c)(4). Factual and legal questions regarding Defendants' conduct, including whether the Lebanese Banking Enterprise existed and whether Defendants were members of it, whether Defendants committed predicate acts constituting a pattern of racketeering activity, and whether Defendants engaged in a conspiracy are common questions that can be efficiently and appropriate answered on class wide basis as to every member of the Classes.

## **FIRST CAUSE OF ACTION**

### **Violations of the Racketeer Influenced and Corrupt Organizations Act**
### **18 U.S.C. § 1962(c) and (d)**
### **(Individually, and on behalf of the Class, against all Defendants)**

113.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 112 above as if fully repeated and set forth herein.

114.     This Claim for relief alleges violations of 18 U.S.C. §§ 1962(c)–(d).

115.     At all relevant times, Plaintiff was a "person[s]" within the meaning of 18 U.S.C. §§ 1961(3), 1962(c).

### **1.     Structure of the Lebanese Banking Enterprise**

116.      At all relevant times, Defendants and the Non-Party Bank Co-conspirators, in violation of RICO, conducted (managed) or participated, directly or indirectly, in the conduct (management) of the Lebanese Banking Enterprise, through a pattern of unlawful or otherwise prohibited activity:

117.     **Name:** At all relevant times, there existed an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4), 1962(c) – to wit, an association-in-fact comprised of each of the Defendants – referred to herein as "The Lebanese Banking Enterprise."

118.     **Continuity**: The continuity of the Lebanese Banking Enterprise was coterminous with the period of time necessary to defraud Plaintiff and other depositors.

119.     **Effect on Commerce**: The Lebanese Banking Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

120.     **Membership and Roles of Each Class of Participant**: The Lebanese Banking Enterprise reflected several types of participants, not all of which were complicit, and not all of which are named herein as Defendants:

a. **BDL and Salameh**. BDL and Salameh were at the center of, and orchestrated, the Lebanese Banking Enterprise; and

b. The Commercial Bank Conspirators.

121. The Lebanese Banking Conspiracy was a "hub-and-spokes" conspiracy with BDL at the center, and with relationships with each of the Commercial Bank Conspirators, but also with communications from time to time among the Commercial Bank Conspirators.

### 2. The Common Purpose and Scheme of the Lebanese Banking Enterprise

122. The lawful purpose of the Lebanese Banking Enterprise was providing financial services typically provided by banks. The unlawful purpose of the Lebanese Banking Enterprise was to engage in and carry out an intentional scheme to defraud depositors, by misrepresenting the financial health of the Lebanese banking system, and of the Commercial Bank Conspirators, and fraudulently representing to depositors that they would be able to access their deposits, in order to solicit depositors to maintain deposits of US dollars with the Commercial Bank Conspirators.

### 3. Predicate Acts

123. At all relevant times, Defendants conducted (managed) or participated, directly or indirectly, in the conduct (management) of the Lebanese Banking Enterprise, through a pattern of unlawful activity. In addition to participating in a RICO-violative enterprise, Defendants, with full knowledge and purpose, conspired, in violation of 18 U.S.C. § 1962(d), to violate § 1962(c). Defendants did so by engaging in multiple, repeated, and continuous violations of:

a. **Wire Fraud, 18 U.S.C. § 1343**. Defendants, in violation of § 1343, transmitted communications electronically to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of asserting false claims through fraud and to engage in an intentional scheme to defraud Plaintiff and other U.S. depositors.

b. **Mail Fraud, 18 U.S.C. § 1341.** Defendants, in violation of § 1341, transmitted communications through the U.S. Mail to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of asserting false claims through fraud and to engage in an intentional scheme

to defraud Plaintiff and other U.S. depositors.

    c.    **Money Laundering, 18 U.S.C. § 1956.** Defendants, in violation of § 1956, received funds from U.S. sources to facilitate the laundering of illegally obtained money from corrupt public officials and other favored depositors. While prohibiting U.S. depositors from withdrawing their deposits, the Commercial Bank Conspirators permitted favored insiders to withdraw money (the dollars deposited by Americans) and transfer those funds to banks in Switzerland and elsewhere.

124.    The Lebanese Banking Enterprise had a hierarchical decision-making structure that was headed by BDL and supported by the Commercial Bank Conspirators.

125.    The scheme devised and implemented by BDL and the other members of the Lebanese Banking Enterprise amounted to a common course of conduct intended to increase and retain deposits from U.S. depositors in order to enrich insiders who were able to withdraw their assets from the Lebanese banking system. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

126.    The United States was not peripheral to this conspiracy. *United States depositors were the intended and actual target of this conspiracy.* Dollars were what BDL and the Commercial Bank Conspirators needed, and they turned to Lebanese Americans, like the Plaintiff, to provide those dollars.

127.    To achieve the common goal and purpose of the Lebanese Banking Enterprise, the Defendants and members of the Lebanese Banking Enterprise hid from depositors the desperate financial condition of BDL, the Commercial Bank Conspirators and the Lebanese financial system. The system was a house of cards, and the Commercial Bank Conspirators simply lacked insufficient assets as compared with the face amount of the dollar accounts held by Plaintiff and other depositors, and BDL lacked sufficient assets to back up the Commercial Bank Conspirators' deposits with BDL.

128.    Each member of the Lebanese Banking Enterprise agreed, with knowledge and

intent, to the overall objective of the scheme and participated in the common course of conduct to commit acts of fraud.

129. Indeed, for the fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulently misrepresenting their financial condition and continuing to solicit and accept additional deposits when they knew of the insolvency of the Bank Depositors and the entire Lebanese financial system.

130. The Defendants' predicate acts all had the purpose of defrauding unfavored depositors to allow insiders to withdraw their assets and move them to safer banks in Switzerland and other foreign destinations. The predicate acts were committed or caused to be committed by the through their participation in the Lebanese Banking Enterprise and in furtherance of its fraudulent scheme.

131. Defendants' actions went far beyond what could be considered ordinary business conduct. For decades, Defendants worked together in an illicit enterprise, engaging in conduct that was not only illegal, but in certain respects anti-competitive, with the common purpose and achievement of vastly increasing their deposits of U.S. dollars.

132. As described above, at all relevant times, Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing and retaining deposits from U.S. investors into an insolvent financial system.

133. At all relevant times, as described above, Defendants exerted control over, conducted and/or participated in the Lebanese Banking Enterprise by fraudulently claiming that they, and the overall system, were solvent.

134. Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier,

and related documents by mail or by private carrier affecting interstate commerce.

135.    Each of the Commercial Bank Conspirators solicited depositors throughout the United States.

136.    Defendants used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities. Specifically, Defendants made misrepresentations about their financial health and the health of the Lebanese banking system and repeatedly disseminated this information to Plaintiff and other U.S. depositors.

137.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive U.S. depositors.

138.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden by Defendants and cannot be alleged without access to Defendants' books and records.

139.    Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants or identified in this Complaint, may have contributed to and/or participated in the scheme with Defendants in these offenses and have performed acts in furtherance of the scheme.

140.    The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining and retaining deposits from U.S. depositors. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

### 4.    Pattern of Unlawful Activity

141.    Defendants' scheme described herein was perpetrated, in part, through multiple acts

of mail fraud and wire fraud as described herein.

142.     The pattern of unlawful activity used by the Lebanese Banking Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Lebanese Banking Enterprise.

143.     These communications included essentially uniform misrepresentations, concealments and material omissions regarding the financial health of the Commercial Bank Conspirators and the Lebanese financial system. Each of these fraudulent mailings and interstate wire transmissions constitutes an unlawful act, and, collectively, these violations constitute a pattern of unlawful activity, through which BDL and the Commercial Bank Conspirators defrauded and intended to defraud Plaintiff and other depositors. The Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids' marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia*:

    (1)    The dissemination of annual financial statements and other documents to Plaintiff and other U.S. depositors that misrepresented the actual financial condition of the Commercial Bank Conspirators and the Lebanese financial system;

    (2)    Written representations (including text messages and emails) and telephone calls between the Bank Defendants and U.S. Depositors concerning their solvency and the prospective ability of depositors to access their funds; and

    (3)    Receipts of deposits sent through the U.S. Mail and interstate wire facilities.

144.     At all relevant times, Defendants conducted (managed) or participated, directly or indirectly, in the conduct (management) of the Lebanese Banking Enterprise, through a pattern of unlawful activity, by engaging in multiple, repeated, and continuous acts of mail fraud and wire fraud. Defendants transmitted electronic communications to designated persons for ostensibly

legitimate purposes, but with the actual, unlawful purpose of engaging in an intentional scheme to defraud Plaintiff and other U.S. depositors.

### 5. Consequences

145.    By reason of the above-referenced violations of 18 U.S.C. § 1962(c)–(d), Plaintiff was injured in his business or property within the meaning of 18 U.S.C. § 1964(c) and is entitled to assert this claim and to recover threefold the damages he sustained, as demonstrated at trial, and the cost of the suit, including reasonable attorneys' fees, as well as such other appropriate relief, as the Court may provide.

**SECOND CAUSE OF ACTION**

**Common Law Fraud**
**(Individually, and on behalf of the Subclass, against the Commercial Bank Defendants)**

146.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 112 above as if fully repeated and set forth herein.

147.    Plaintiff is a depositor with Byblos. All members of the Subclass were depositors with one or more of the Commercial Bank Conspirators.

148.    The Commercial Bank Conspirators fraudulently induced Plaintiff and other Americans to maintain USD deposits, using the false representations of high interest and ready access to their USD through transfers outside Lebanon.

149.    The Commercial Bank Conspirators, all disseminated false financial statements that inaccurately portrayed their finances to its depositors.

150.    At all times until at least late 2019, the Commercial Bank Conspirators represented that the deposits of American depositors were safe and could be freely withdrawn or transferred

151.    But the Lebanese banking system was insufficiently backed by foreign currency or other sufficient assets, as the Commercial Bank Conspirators lacked sufficient assets to meet the

possible demands of depositors to withdraw from their accounts.

152.    Unbeknownst to Plaintiff and the Subclass,  the Commercial Bank Conspirators were part of a conspiracy and RICO enterprise-in-fact to hoard USD to prevent depositors like Plaintiff from withdrawing USD or transferring USD outside Lebanon.

153.    The Commercial Bank Conspirators failed to disclose to Plaintiff and other depositors their perilous financial condition, and the  overall insolvent state of the Lebanese banking system.

154.    These repeated misrepresentations and omissions by the Commercial Bank Conspirators were false and known to be false when made.

155.    Plaintiff and other depositors relied on these misrepresentations omissions to their detriment by maintaining their deposits with the Commercial Bank Conspirators at all times.

156.    After misleading Plaintiff and other depositors for years with affirmative misrepresentations about their ability and intentions, the Commercial Bank Conspirators finally revealed to Plaintiff in late2019 and 2020 they their deposits could not be withdrawn.

157.    As a direct and proximate result of Defendants' fraud, Plaintiff and the other members of the Subclass have suffered and continues to suffer damages in an amount to be determined at trial (for Plaintiff this is presently believed to be well in excess of $1 million).

### THIRD CAUSE OF ACTION

### Civil Conspiracy to Commit Fraud
**(Individually, and on behalf of the Class, against the Commercial Bank Defendants, Salameh and BDL)**

158.    Plaintiff repeats and incorporate by reference paragraphs 1 through 112 above as if fully set forth and realleged herein.

159.    Plaintiff repeats and incorporates by reference paragraphs 116 through 122 above,

which describe the structure and nature of the conspiracy.

160.    Plaintiff repeats and incorporates by reference paragraphs 123 through 144 above, which describe the conduct of the conspirators.

From 1996 until 2019, Plaintiff and the other members of the Class deposited USD with the Commercial Bank Conspirators.  By the end of 2019, Plaintiff had in excess of $1 million USD on deposit at Byblos.

161.    When Plaintiff and other members of the Class attempted to transfer their USD from his bank accounts in Lebanon to the United States, however, they were confronted by the conspiracy within the Lebanese banking system to hoard USD by intentionally misleading their depositors and misappropriating their depositors' USD.

162.    Unbeknownst to Plaintiff and other members of the Class, Defendants had agreed to unlawfully refuse to allow Plaintiff and certain other USD depositors to transfer their USD outside Lebanon and to instead misappropriate Plaintiff's USD for their own use to the exclusion of Plaintiff and other foreign depositors.

163.    Defendants had also agreed to make fraudulent misrepresentations to Plaintiff and the Class to carry out their scheme of hoarding USD in Lebanon and misappropriating Plaintiff's and the Class's USD on deposit with the Commercial Bank Conspirators to do so.

164.    Defendants used wire communications, including emails, telephone calls, and text messages, to make fraudulent misrepresentations to Plaintiff, the Class and United States financial institutions while Defendants misappropriated U.S. Depositors' USD in Lebanon.

165.    The Commercial Bank Conspirators agreed to use the mail and wires to deliver fraudulent documents to Plaintiff and other Class Members in the U.S. in violation of United States law in order to carry out their scheme of misappropriating Plaintiff's and the Class's USD.

## **FOURTH CAUSE OF ACTION**

### **Breach of Contract**
### **(Individually, and on behalf of the Subclass, against the Commercial Bank Defendants)**

166.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 112 above as if fully repeated and set forth herein.

167.     Plaintiff and each member of the Subclass entered into an agreement pursuant to which Plaintiff and the Subclass members agreed to deposit with one or more of the Commercial Bank Conspirators.

168.     The Commercial Bank Conspirators agreed to pay Plaintiff and the Subclass interest on their deposited USD.

169.     In addition, the Commercial Bank Defendants agreed that (following, in some instances, a short initial maturity period) that US depositors could withdraw or transfer their deposits (including accrued interest) from their accounts.

170.     Plaintiff and the other members of the Subclass complied with their obligations under their agreements.

171.     Plaintiff and the other members of the Subclass attempted to withdraw, and continue to attempt to withdraw, the funds in their accounts.

172.     In breach of their fundamental contractual obligations, the Commercial Bank Conspirators, as part of their arrangement with BDL, systematically failed and refused to comply with instructions from US depositors to withdraw USD.

173.     In fact, the Commercial Bank Conspirators in bad faith misappropriated all of Plaintiff's and the Subclass's deposits and accrued interest.

174.     As a result of the Commercial Bank Conspirators' breach, Plaintiff and the Subclass

have suffered and continue to suffer damages in an amount to be determined at trial (in Plaintiff's case, presently believed to be well in excess of $1 million).

## FIFTH CAUSE OF ACTION

### Conversion
### (Individually, and on behalf of the Class against BDL and Salameh, and on behalf of the Subclass against the Commercial Bank Defendants)

175.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 112 above as if fully repeated and set forth herein.

176.    Plaintiff and the other members of the Classes had on deposit with the Commercial Bank Defendants specific, identifiable sums of money.

177.    Each depositor had the right to possess and use their deposits.

178.    BDL, Salameh and the Commercial Bank Defendants intended to deprive Plaintiff and the other members of the Classes of their deposits.

179.    BDL, Salameh and the Commercial Bank Defendants deprived Plaintiff and the other members of the Classes  of their rights to use and possess their identifiable deposits.

180.    As a direct and proximate result of Defendants' conversion of their personal property, Plaintiff and the Classes have been damaged in an amount to be determined at trial (for Plaintiff,  presently believed to be well in excess of $1 million).

## SIXTH CAUSE OF ACTION

### Unjust Enrichment
### (Individually, and on behalf of the Class, against All Defendants)

181.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 112 above as if fully repeated and set forth herein.

182.    The Commercial Bank Defendants, BDL and Salameh have been unjustly enriched by their misappropriation of the deposits of Plaintiff and the Class.

183. The BDL Accounting Defendants and Byblos Accounting Defendants, who were negligent and aided and abetted fraudulent conduct, should not in good conscience be able to keep the professional fees and other remuneration received for their work.

184. It would be against equity and good conscience to permit Defendants to retain what they have misappropriated from Plaintiff and the Class.

## SEVENTH CAUSE OF ACTION

### Promissory Estoppel
**(Individually, and on behalf of the Subclass, against the Commercial Bank Defendants)**

185. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 112 above as if fully repeated and set forth herein.

186. The Commercial Bank Defendants represented to Plaintiff that Plaintiff could freely withdraw his deposits or transfer them to bank accounts outside Lebanon.

187. Plaintiff reasonably relied upon The Commercial Bank Defendants' representations.

188. The Commercial Bank Defendants refused to honor their representations to Plaintiff and the Subclass, and never allowed Plaintiff and the Subclass to access their deposits.

189. In detrimental reliance on the Commercial Bank Defendants' misconduct, Plaintiff and the Subclass have been damaged in an amount to be determined at trial (Plaintiff has been damaged in an amount presently believed to be well in excess of $1,000,000).

## EIGHTH CAUSE OF ACTION

### (Negligence)
**(Individually and on behalf of the Byblos Subclass against the Byblos Accounting Defendants)**

190. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 112 above as if fully repeated and set forth herein.

191.    As Byblos' auditors, BDO and EY were responsible for producing accurate financial statements that accurately reflected Byblos's financial condition.

192.    But the financial statements of Byblos were false and misleading, and inaccurately depicted Byblos' financial condition as being much better than it actually was.

193.    BDO and EY were negligent, and failed to act in accordance with the standards of care applicable to their profession, in their audits of Byblos.

194.    BDO and EY knew that depositors, such as Plaintiff and other members of the Byblos Subclass, would rely on the accuracy of Byblos' financial statements in determining whether to maintain their deposits with Byblos and/or make additional deposits.

195.    Had Plaintiff and other members of the Byblos Subclass known of the perilous financial condition of Byblos, they would have withdrawn their deposits well before it became impossible to do so.

196.    EY and BDO are integrated international professional firms that tout themselves, and operate, as a de facto single entity. As such EY USA and BDO USA are liable for the tortious conduct of their affiliates in other regions.

197.    As a result, Plaintiff and the Byblos Subclass have suffered damages.

### NINTH CAUSE OF ACTION

**Aiding and Abetting Fraud**
**(Individually, and on behalf of the Byblos Subclass, against**
**the Byblos Accounting Defendants)**

198.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 112 above as if fully repeated and set forth herein.

199.    Byblos with the aid and approval of BDO and EY intentionally and unlawfully made knowingly false statements and misrepresentations to Plaintiff and other depositors in order

to cause depositors to make additional US dollar deposits, and to continue to maintain those deposits.

200.    BDO and EY, through their access to Byblos books and records, and participation in preparing fraudulent financial statements, had knowledge that Byblos was defrauding depositors.

201.    By signing off on Byblos' financial statements, BDO and EY provided substantial assistance to Byblos in its efforts to continue holding US dollar deposits and to solicit additional deposits.

202.    BDO and EY knew that Byblos' misrepresentations were designed to induce the depositors to deposit and maintain dollar deposits at Byblos.

203.    EY and BDO are integrated international professional firms that tout themselves, and operate, as de facto single entities. As such EY USA and BDO USA are liable for the tortious conduct of their affiliates in other regions.

204.    As a direct and proximate result of BDO's and EY's aiding and abetting Byblos's fraudulent conduct, Plaintiff and the other members of the Byblos Subclass have been damaged.

## TENTH CAUSE OF ACTION

### Negligence
**(Individually, and on behalf of the Class, against the BDL Accounting Defendants)**

205.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 112 above as if fully repeated and set forth herein.

206.    As BDL's auditors, Deloitte and EY were responsible for producing accurate financial statements that accurately reflected Byblos's financial condition.

207.    But the financial statements of BDL were false and misleading, and inaccurately depicted BDL's financial condition as being much better than it actually was.

208. Deloitte and EY were negligent, and failed to act in accordance with the standards of care applicable to their profession, in their audits of BDL.

209. Deloitte and EY knew that depositors, such as Plaintiff and other members of the Class, would rely on the accuracy of BDL's, and on the accuracy of the Commercial Bank Conspirators' financial statements, in determining whether to maintain their deposits with the Commercial Bank Conspirators and/or make additional deposits.

210. If BDL was a house of cards, so was each of the Commercial Bank Conspirators. If the Commercial Bank Conspirators' deposits with BDL were worth considerably less than 100 cents on the dollar, then each of the Commercial Bank Conspirators' financial statements grossly overstated their assets. The BDL Accounting Defendants' negligence had ripple effects, as they completely failed to perform their responsibilities, enabling the perpetuation of the Defendants' fraud and the collapse of the Lebanese financial system.

211. Had Plaintiff and other members of the Class known of the perilous financial condition of BDL, and the negligible value of the Commercial Bank Conspirators purported assets associated with BDL, they would have withdrawn their deposits well before it became impossible to do so.

212. Deloitte and EY are integrated international professional firms that tout themselves, and operate, as a de facto single entity. As such EY USA and Deloitte USA are liable for the tortious conduct of their affiliates in other regions.

213. As a result, Plaintiff and the Class have suffered damages.

### ELEVENTH CAUSE OF ACTION

### Aiding and Abetting Fraud
**(Individually, and on behalf of the Class, against the BDL Accounting Defendants)**

214. Plaintiff realleges and incorporates by reference the allegations set forth in

paragraphs 1 through 112 above as if fully repeated and set forth herein.

215.    BDL with the aid and approval of BDO and EY intentionally and unlawfully made knowingly false statements and misrepresentations in order to cause depositors to make additional US dollar deposits, and to continue to maintain those deposits.

216.    BDO and EY, through their access to BDL's books and records, and participation in preparing fraudulent financial statements, had knowledge that BDL was at the center of a centrally orchestrated conspiracy to defraud depositors with the Commercial Bank Conspirators.

217.    By signing off on BDL's financial statements for 2015-17, and failing to timely issue financial statements for 2018, BDO and EY provided substantial assistance to Byblos in its efforts to continue holding US dollar deposits and to solicit additional deposits.

218.    BDO and EY knew that BDL's misrepresentations were designed to induce the depositors to deposit and maintain dollar deposits at Byblos.

219.    EY and BDO are integrated international professional firms that tout themselves, and operate, as de facto single entities. As such EY USA and BDO USA are liable for the tortious conduct of their affiliates in other regions.

220.    As a direct and proximate result of BDO's and EY's aiding and abetting Byblos's fraudulent conduct, Plaintiff and the other members of the Class have been damaged.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands judgment as follows:

A.    Certifying this action as a class action;

B.    Awarding compensatory damages, and treble damages, to Plaintiff and the Classes, together with prejudgment interest from the dates of deposit into each account;

C.    Awarding Plaintiff and the Classes attorney fees and the costs and disbursements of this action; and

D.    Granting such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.


Dated: April 16, 2024

CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C

 */s/ James E. Cecchi*
James E. Cecchi
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

Charles J. Laduca
Daniel M. Cohen
Monica Miller
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
charles@cuneolaw.com
daniel@cuneolaw.com
monica@cuneolaw.com

Robert K. Shelquist
Rebecca A. Peterson
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Telephone: 612-339-6900
rkshelquist@locklaw.com
rapeterson@locklaw.com

John W. ("Don") Barrett
Katherine Barrett Riley
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095

Telephone: (662) 834-2488
donbarrettpa@gmail.com
kbriley@barrettlawgroup.com

*Counsel for Plaintiff and the Classes*