James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

[Additional Attorneys On Signature Page]

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARIM P. NAJJAR, *et. al.*, individually and behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> RIAD SALAMEH, *et al.*, <br><br> Defendants. | Civil Action No. 1:24-cv-05043-CPO-EAP <br><br> Hon. Christine P. O'Hearn, U.S.D.J. <br> Hon. Elizabeth A. Pascal, U.S.M.J. <br><br> **Motion Date: March 17, 2025** |

## PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN <u>OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................1

I.      THE COLLAPSE OF THE LEBANESE FINANCIAL SYSTEM ................1

II.     A MASSIVE ACCOUNTING FRAUD WAS AT THE CENTER OF
        THE LEBANESE BANKING CRISIS ...........................................................4

        A.      Revelation of Accounting Fraud at the Commercial Banks ................4

        B.      Revelation of Accounting Fraud at BDL .............................................6

III.    THE ACCOUNTING DEFENDANTS ..........................................................9

        A.      Deloitte ...............................................................................................10

        B.      EY .......................................................................................................12

        C.      BDO ....................................................................................................13

ARGUMENT ........................................................................................................14

I.      THE COURT SHOULD STAY THIS MOTION PRACTICE PENDING
        PRELIMINARY DISCOVERY RELATING TO DISPUTED FACTS
        RAISED BY DEFENDANTS IN THEIR MOVING PAPERS ...................14

II.     THE U.S. ACCOUNTING ENTITIES ARE LIABLE FOR THE
        CONDUCT OF THE TRANSNATIONAL ACCOUNTING FIRMS .........16

III.    PLAINTIFFS HAVE STATED ACTIONABLE CLAIMS AGAINST
        THE TRANSNATIONAL ACCOUNTING FIRMS ....................................20

        A.      Plaintiffs Have Pleaded Actionable Claims of Aiding and
                Abetting Fraud ....................................................................................20

        B.      Plaintiffs Have Pleaded Actionable Claims of Negligence ...............23

        C.      Plaintiffs Have Pleaded an Actionable Claim of Unjust
                Enrichment ..........................................................................................26

        D.      RICO ...................................................................................................27

IV.    TO THE EXTENT THAT THE MOTIONS ARE GRANTED IN
       WHOLE OR IN PART, DISMISSAL SHOULD BE WITHOUT
       PREJUDICE..................................................................................................27

CONCLUSION ........................................................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Abbott v. Herzfeld & Rubin, P. C.*
202 A.D.2d 351, 609 N.Y.S.2d 230 (1994) .......................................................25

*Armstrong v. McAlpin*,
699 F.2d 79 (2d Cir.1983)...............................................................................21

*AUSA Life Ins. Co. v. Dwyer*,
928 F. Supp. 1239 (S.D.N.Y. 1996)................................................................24

*Calcutti v. SBU, Inc.*,
273 F.S upp. 2d 488 (S.D.N.Y. 2003)..............................................................21

*Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*,
347 F.3d 448 (2d Cir. 2003).............................................................................17

*Credit Alliance Corp. v. Arthur Andersen & Co.*,
65 N.Y.2d 536 (1985) ......................................................................................24

*Cromer Finance Ltd. v. Berger*,
2002 WL 826847 (S.D.N.Y. May 2, 2002)...........................................18, 19, 20

*Franklin Med. Assocs. v. Newark Pub. Schs.*,
362 N.J. Super. 494, 828 *A*.2d 966 (App. Div. 2003) .......................................21

*In re Integrity Ins. Co.*,
240 N.J. Super. 480, 573 A.2d 928 (App. Div. 1990)........................................22

*Judson v. Peoples Bank & Trust Co.*,
25 N.J. 17, 134 A.2d 761 (1957) ......................................................................21

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001).............................................................................15

*Lombard v. Booz–Allen & Hamilton, Inc.*,
280 F.3d 209 (2d Cir.2002)...............................................................................23

*Lovelace v. Software Spectrum, Inc.*,
78 F.3d 1015 (5th Cir. 1996).............................................................................15

*Mandarin Trading v. Wildenstein,*
  16 N.Y.3d 173 (2011) .........................................................................26

*Maurillo v. Park Slope U–Haul,*
  194 A.D.2d 142, 606 N.Y.S.2d 243 (1993) ......................................17

*Mueller v. Seaboard Commercial Corp.,*
  5 N.J. 28, 73 A.2d 905 (1950).............................................................17

*N.J. Lawyers' Fund for Client Prot. v. Stewart Title Guar. Co.,*
  203 N.J. 208, 1 A.3d 632 (2010).........................................................17

*N.Y. Marine & Gen. Ins. Co. v. Tradeline, L.L.C.,*
  266 F.3d 112 (2d Cir. 2001)................................................................17

*In re Parmalat Sec. Litig.,*
  375 F. Supp. 2d 278 (S.D.N.Y. 2005)..............................17, 18, 19, 20

*Staehr v. Hartford Financial Services Group, Inc.,*
  547 F.3d 406 (2d Cir. 2008)................................................................15

*Thornwood, Inc. v. Jenner & Block,*
  344 Ill. App. 3d 15 (2003)...................................................................21

*In re XM Satellite Radio Holding Securities Litig.,*
  479 F. Supp. 2d 165 (D.D.C 2007) ....................................................15

*Zahl v. Krupa,*
  399 Ill. App. 3d 993, 927 N.E.2d 262 (2010) ....................................16

**Statutes**

New Jersey's Accountants Liability Act, N.J.S.A. 2A:53A-25(b).........................25

**Other Authorities**

Restatement (Second) of Torts, § 552(1) .................................................24

Restatement (Second) of Torts, § 876(b) ................................................20

Restatement (Third) of Agency, § 1.01....................................................17

Restatement (Third) of Restitution and Unjust Enrichment, § 1............................26

Plaintiffs Karim P. Najjar, Halim Abou-Faycal, Younes Bazzi, Jacques Fontaine, Mounir Jermany, Ibrahim Khreibani, Bechara Rizk, Samar Shami, Joseph Tleiji, Salim Tleiji and Ramzi Zibaoui ("Plaintiffs") by their attorneys, respectfully submit this omnibus memorandum of law in opposition to Defendant BDO USA, P.C.'s Motion to Dismiss Plaintiffs' First Amended Class Action Complaint [Dkt. No. 37], Defendants Deloitte LLP and Deloitte & Touche LLP Motion to Dismiss the First Amended Class Action Complaint [Dkt. No. 38], and Defendant Ernst & Young U.S. LLP's Motion to Dismiss Plaintiffs' First Amended Class Action Complaint [Dkt No. 39] (collectively, the "Motions"). For the reasons stated below, the Motions should be denied.

## INTRODUCTION

## I.    THE COLLAPSE OF THE LEBANESE FINANCIAL SYSTEM

As alleged in Plaintiffs' First Amended Complaint [Dkt. No. 3] ("FAC"), Defendant Banque du Liban ("BDL") is the central bank of Lebanon. ¶ 27.[1] By early 2015, Lebanese banks began recognizing depleting USD deposits, which strained the system as the banks' interest obligations increased. ¶ 52. In 2015, Lebanon's foreign remittances and dollar liquidity decreased for the first time since the pegging of the Lebanese pound (also referred to at times as the lira) to the United States

---

[1] Citations to "¶_" and "¶¶__" refer to paragraphs of the FAC.

1

Dollar (the "Dollar" or "U.S. Dollar") began in the 1990s, resulting in a soaring budget deficit. ¶ 7.

Beginning in 2016, BDL began offering the Commercial Bank Conspirators lavish returns on any new U.S. dollars they could bring in from their clients—a process known as "financial engineering"—to resolve dwindling confidence in the Lebanese economy in the years beforehand. The Commercial Bank Conspirators attracted new U.S. dollars by offering exorbitant and unsustainable high interest rates to depositors, while knowing they would have to fraudulently induce new depositors to pay back the interest rates and keep their scheme propped up. ¶ 54.

Specifically, Lebanese commercial bank personnel targeted U.S. citizens to solicit only new U.S. Dollar deposits while the potential depositors were in the United States. The Commercial Bank Conspirators used mediums such as WhatsApp call and messaging, email, and phone conversations to solicit depositors. ¶ 55.

Because BDL and the Commercial Bank Conspirators were intent on keeping a curtain over the growing problem so they could continue to enrich themselves notwithstanding the unsustainability of their policies, they did not alter their business model. ¶ 56.

Instead, BDL and the Commercial Bank Conspirators agreed that they would engage in an illegal scheme to cover up and delay the self-created and looming crisis, all so that they could cover up their failed policies and continue enriching

themselves. ¶ 57.

BDL and the Commercial Bank Conspirators agreed they would offer even higher interests to lure new U.S. dollar deposits and to induce depositors to retain their deposits in Lebanon, knowing the banks could never sustain the interest payments. BDL and the Commercial Bank Conspirators agreed they would project strength and health for the Lebanese banking system they knew was facing an imminent liquidity crisis. ¶ 58.

The conspirators agreed to specifically target people of Lebanese descent living abroad, particularly United States citizens and residents. ¶ 59. The fraud was continuing against Plaintiffs and the class as their accounts continued to be credited with interest while Defendants knew that the accruing interest could not be paid if there was an immediate withdrawal request.

As a result of BDL's "financial engineering" scheme, the amount of U.S. dollar deposits with the Commercial Bank Conspirators ballooned between 2015 and 2019. Foreign currency deposits at BDL increased by 119% from the end of 2015 and the end of 2020. ¶ 60.

At the same time, the assets held by BDL deteriorated dramatically. Foreign currency assets held outside of Lebanon fell dramatically—from $35.8bn in 2015 to $18.4bn in 2020. ¶ 61.

Locally held foreign currency assets increased from $12.7bn in 2015 to

$21.2bn in 2020. But these "locally held" assets consist "primarily amounts owed to BDL from the state," as to which A&M concluded "there is considerable uncertainty as to its recoverability" (a vast understatement). ¶ 62.

BDL moved from a foreign currency surplus of $7.2bn at the end of 2015 to a shortage of $50.7bn at the end of 2020. But the reality is worse than that. If locally held assets (which are largely worthless) are excluded, "the shortage in foreign currency reserves as of 31 December 2020 increases to USO 71.9bn. Given GDP in 2020 of USO 31.2bn, this equates to 230% of GDP." ¶ 63. BDL and the Commercial Bank Conspirators would all be in receivership if they were operating in the United States. They collectively solicited huge volumes of dollar deposits, and then those dollars went through BDL and left the country. ¶ 64.

## II. A MASSIVE ACCOUNTING FRAUD WAS AT THE CENTER OF THE LEBANESE BANKING CRISIS

### A. Revelation of Accounting Fraud at the Commercial Banks

In their audits for the year ending December 31, 2019, and for the years ending December 31, 2020, December 31, 2021, and December 31, 2022, the Byblos Accounting Defendants,[2] belatedly, issued an "adverse opinion" noting that they could not concur with the financial statements issued by Byblos. For 2019, in a report that was not issued until June 30, 2020, for example, the Byblos Accounting

---

[2] This includes Defendants Ernst & Young U.S. LLP, Ernst & Young U.S. LLP, and BDO USA, P.C. ¶ 43.

Defendants noted that it was questionable whether Byblos' balances held with BDL were really worth the amount stated on Byblos' balance sheet and that adjustments needed to be made to the carrying amount of these assets:

> As disclosed in Note 49.2 to the consolidated financial statements, the Group holds assets with the Central Bank of Lebanon, a portfolio of Lebanese government debt securities, a portfolio of loans to the private sector and other assets concentrated in Lebanon. As disclosed in Note 1, the accompanying consolidated financial statements do not include IFRS 9 adjustments to the carrying amounts of these assets and related disclosures that would result from the resolution of the uncertainties disclosed therein and the future effects of the economic crisis and the restructuring plan. In addition, as disclosed in Note 48, these consolidated financial statements do not include IFRS 13 fair value disclosures for these financial assets and other financial instruments concentrated in Lebanon. Had such adjustments and disclosures been made, many elements and related disclosures in the accompanying consolidated financial statements would have been materially affected. The effects on these consolidated financial statements have not been determined.

¶ 96.

But it was too little too late. The horse had already left the barn, the barn was on fire, and the collapse of the Lebanese financial system had become public knowledge a months before the 2019 financial statements were released (in early 2020). The Byblos Accounting Defendants should have issued adverse opinions for 2017 and 2018, too, but failed to do so. They had a responsibility to proactively examine, with their full access to Byblos' books and records, the collectability of this rather conspicuous gorilla asset on Byblos' balance sheet, and not to wait for media reports to issue an adverse opinion. ¶ 97.

On June 4th, 2020, a man identified as Antoine Dagher, Group Ethics and Fraud Risk Manager at Byblos, was found dead in the parking garage of his own home in Hazmieh, Lebanon. He was hit in the head with a sharp tool that fractured his skull. Dagher, who was in his 60s, died instantly. Somebody did not want his knowledge to become public. ¶ 98.

## B.    Revelation of Accounting Fraud at BDL

In or around June 2020, the BDL Accounting Defendants[3] finally released to BDL their financial statements for 2018, over a year after that task would be customarily completed. They should have done so in early 2019. The 2018 financials were issued with "qualifications" from BDL's accountants ( EY and Deloitte (as defined below)). The 2018 report shows a number of methods used to inflate assets and minimize liabilities of BDL. BDL Recorded as an asset a LBP 10.27 tn ($6.82bn) asset described as "seigniorage on financial stability," representing the difference between the cost of printing new money and its face value. Seigniorage is usually listed by central banks as an income stream, not an asset. As well as the unorthodox seigniorage accounting, the central bank also booked questionable supposed profits on lending to the government. Deloitte and EY also said the central bank used an accounting and financial reporting framework adopted by its own council, rather

---

[3] This includes Defendant Deloitte, LLP, Deloitte & Touche, LLP, Deloitte Touche Tomatsu, Limited, Ernst & Young U.S. LLP, and Ernst & Young U.S. LLP. ¶ 44.

than International Financial Reporting Standards (IFRS). The exceptions noted by the BDL Accounting Defendants were too little too late. BDL was a disaster, and had been for years. BDL had issued years of fraudulently inflated financials, and the BDL Accounting Defendants bear responsibility for allowing BDL to continue to orchestrate a fraudulent scheme to suck Dollars into Lebanon for the benefit of insiders such as Defendant Salameh. ¶ 97.

But the situation at BDL, and the Lebanese Commercial Banks, was considerably more dire than depicted by the BDL Accounting Defendants.

Under an engagement letter dated August 24, 2021, Alvarez & Marsal Middle East Limited ("A&M") was engaged by the Republic of Lebanon as represented by its Ministry of Finance to perform a forensic audit and a governance and controls assessment of BDL. On or about August 8, 2023, A&M released its "Preliminary Forensic Audit Report" ("A&M Report") a document well in excess of 300 pages, summarizing its findings to date. ¶ 100.

BDL did not cooperate with the audit, attempting to further conceal what transpired. A&M noted that BDL did not permit A&M to perform its audit on-site nor to interview any BDL employees, and failed to provide many requested categories of documents. ¶ 101.

A&M reported that, starting in 2015, BDL centrally orchestrated a campaign of "financial engineering" to incent the other Commercial Bank Conspirators to

solicit and maintain deposits of US dollars. BDL would obtain badly needed dollars by acquiring Lebanese treasury bonds from the Commercial Bank Conspirators at a premium, in exchange for the Commercial Bank Conspirators investing dollars in Eurobonds issued by BDL. A&M concluded that this program was poorly conceived and the risks associated with it largely overlooked. BDL's directive resulted in " a 119% increase in foreign-currency denominated deposits, fueled by the BDL's financial engineering programs, while foreign-currency denominated assets fell by 18%." At Byblos, for example, dollar-denominated deposits rose LBP 5.2 tn to LBP 13.9 tn between 2015 and 2020. This was very much a house of cards—as Byblos and the other Commercial Bank Conspirators had increasingly large nominal dollar deposits, but fewer actual dollars. A&M reported that, if domestic assets (which were of questionable, if any, value) are disregarded, "the shortage in foreign currency reserves as of 31 December 2020 increases to [$]71.9bn," which "[g]iven GDP in 2020 of [$]31.2bn,7 this equates to 230% of GDP." ¶ 102.

A&M further concluded that **BDL's financial statements from 2015-2020 were inaccurate.** BDL's financial statements, A&M concluded, "were prepared using unconventional accounting policies" which "allowed B[D]L to overstate assets, equity and profits while understating liabilities - and to close each year-end in amounts specified by the Governor without explanation for the amounts chosen." A&M further concluded that BDL completely lacked internal controls or any

meaningful internal audit function. A&M further noted that there were no meaningful discussions, much less dissenting views presented, at board meetings, as the Governor's proposals were simply rubber stamped. The BDL Accounting Defendants completely failed to apply applicable accounting principles in their annual audits of BDL's financials. The BDL Accounting Defendants were negligent in performing their responsibilities. They knew that BDL was engaged in fraud, and provided substantial assistance to BDL in its fraudulent course of conduct. ¶ 103.

## III.    THE ACCOUNTING DEFENDANTS[4]

Defendant Deloitte, LLP and Deloitte & Touche, LLP (collectively "Deloitte USA") are Delaware limited liability partnerships with their principal place of business in New York, New York. Defendant Deloitte Touche Tomatsu, Limited ("DTTL") is a private company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom. Deloitte USA is the United States member firm, and DTTL is the parent, of the multinational consortium of professional services firms known as "Deloitte." ¶ 41.

Defendant Ernst & Young U.S. LLP ("EY USA") is a Delaware limited liability partnership with its principal place of business in New York, New York. Defendant Ernst & Young Global Limited ("E&Y Global") is a private company

---

[4] "Accounting Defendants" collectively refers to the Byblos Accounting Defendants and the BDL Accounting Defendants, and includes Deloitte, EY and BDO USA.

organized under the laws of the United Kingdom with its principal place of business in London, United Kingdon. EY USA is the United States member firm, and E&Y Global is the parent, of the multinational consortium of professional services firms known as "EY,"

Defendant BDO USA, P.C. ("BDO USA") is a Virginia corporation with its principal place of business in Chicago, Illinois and BDO International ("BDO"), a global accounting network. ¶ 40.

## A.    **Deloitte**

Deloitte is one of the largest professional services networks of its kind in the world. Deloitte operates, effectively, as a single entity, and touts its international integration and ability to provide professional services in all corners of the globe. Deloitte's Lebanon affiliate was one of the two accounting firms to audit BDL's financial statements. As part of Deloitte, that Lebanese affiliate shared a percentage of its revenues and profits with the global Deloitte entity. ¶ 41.

On Deloitte's website, Deloitte lists its "global offices" without reference to any local business entities that might exist or might bear any possible relevance to a potential client.[6] There is Deloitte in New Jersey. There is Deloitte in Beirut. There is Deloitte everywhere. Deloitte describes its presence in Lebanon, with no reference

---

[6] https://www2.deloitte.com/us/en/footerlinks/global-office-directory.html?icid=bottom_global-office-directory.

to a local business entity, as follows:

> Deloitte was providing independent professional advice and services in Lebanon even before the country itself gained its independence. The Deloitte practice in Beirut was established in November 1942, a full year before the Republic of Lebanon was founded. Since then it has looked after the needs of its business community in good times and in bad. Even in the darkest days of the civil war, Deloitte was the only Big 4 firm to retain a full presence in Lebanon during this period, serving its domestic and multinational clients.

> Beirut became the Middle East Firm's regional representative office in 1998 and now has two separate offices: one to provide services to every Deloitte office in the region and the other to look after Lebanese business.

> Just as the Firm has traditionally taken a proactive approach, so today it continues to be a driving force in all initiatives taking place in the market generally, and financial services in particular. Over the years, the Firm has helped promote best practices, representing a major contribution to support the economy and promote transparency in ethical behavior and financial reporting. This tradition has its roots with the founder of the Middle East firm who was the first chartered accountant in the region, and had a strict commitment to promote the accountancy and auditing profession throughout the Arab world.

> Today Deloitte in Lebanon continues to shape the country's future, enhancing transparency, rule and discipline in financial reporting through its Audit services, while helping businesses overcome challenges and improve performance through its Consulting, Enterprise Risk, Tax and Financial Advisory services.[7]

Deloitte does not even pretend that it is a loose association of independent firms. The only "local" thing touted on its website is that the client will have a "local

---

[7] https://www.deloitte.com/middle-east/en/offices/middle-east-offices/beirut.html.

lead contact" who will bring to the client the world wide network—*i.e.*, "coordinate with our network of resources—comprising audit & assurance, tax, consulting, and risk & financial advisory professionals."[8] Indeed, Deloitte is proud to describe itself as "a global network of professionals spanning more than 150 countries and territories who understand the business of private clients."[9]

B.     **EY**

EY, like Deloitte, is one of the largest professional services networks of its kind in the world. EY describes itself as "a globally connected, multidisciplinary professional services organization."[10] EY operates, effectively, as a single entity, and touts its international integration and ability to provide professional services in all corners of the globe. EY's Lebanon affiliate was (1) one of the two accounting firms to audit BDL's financial statements and (2) one of the two accounting firms to audit Byblos' financial statements. As part of EY, that Lebanese affiliate shared a percentage of its revenues and profits with the global EY entity. ¶ 42.

E&Y lists "EY Locations," all identified as locations of "EY," without reference to any local business entities that might exist or might bear any possible

---

[8] https://www2.deloitte.com/us/en/pages/deloitte-private/solutions/deloitte-private-company-services.html.

[9] https://www.deloitte.com/global/en/services/consulting/about/deloitte-private-global-network.html.

[10] https://www.ey.com/en_gl/people/ey.

relevance to a potential client.[11] E&Y identifies its Beirut office as just another location, not unlike a McDonald's or Starbucks:[12]



A visitor to EY's website (like a visitor to Deloitte's) would not comprehend that there is some material difference between EY in the Philadelphia area, or in Beirut. Indeed, EY's stated purpose is nothing less than "Building a better working world," claiming that "[t]he insights and quality services we provide help build trust and confidence in the capital markets and in economies the world over."[13]

### C.    BDO

BDO, like Deloitte and EY, is a transnational accounting practice. BDO operates, effectively, as a single entity, and touts its international integration and ability to provide professional services in all corners of the globe. BDO states that it

---

[11] https://www.ey.com/en_gl/locations.

[12] *See id.*

[13] https://www.ey.com/en_gl/about-us#our-purpose.

is "one organization" and touts that its "global organisation extends across 166 countries and territories, with 115,661 people working out of 1,776 offices – and they're all working towards one goal: to provide our clients with exceptional service."[14] BDO's Lebanon affiliate was one of the two accounting firms to audit Byblos' financial statements. ¶ 40. BDO's Lebanon web page makes no reference to a separate business entity.[15]

## ARGUMENT

## I. THE COURT SHOULD STAY THIS MOTION PRACTICE PENDING PRELIMINARY DISCOVERY RELATING TO DISPUTED FACTS RAISED BY DEFENDANTS IN THEIR MOVING PAPERS

The Accounting Defendants have cited to language in their respective websites that they believe supports their legal argument that the various affiliates that comprise their transnational accounting practices cannot be held liable for each other's tortious conduct. While a court may take judicial notice of the contents of a publication for purposes of demonstrating whether something was actually published or disclosed (*e.g.,* when there is a question of whether a disclosure was actually made or whether persons were put on notice of a statement), it is not appropriate to challenge the allegations of a complaint with materials that the

---

[14] https://www.bdo.global/en-gb/about/global-network.
[15] https://www.bdo-lb.com/en-gb/home.

answering parties believe is pertinent to the facts in dispute.[16] Plaintiffs get to write their own complaints, including which of the defendants' statements go in them.

With the Accounting Defendants Having raised factual disputes, and stated that what the complaint says is not true, Plaintiffs should be permitted to take limited from discovery from Accounting Defendants pertinent to the questions of affiliate liability raised by the present motion practice. This discovery would relate both to how the three transnational accounting practices operate, as well as where the relevant audit work was performed (but not about the substance of the audits). Plaintiffs have sent an inquiry to counsel for the Accounting Defendants to inquire about their willingness to agree on such limited discovery. Absent an agreement, Plaintiffs will likely submit a letter to the Court indicating our intention to move (1)

---

[16] When considering documents ancillary to a complaint and/or about which judicial notice may be taken, a court may only consider the content of the documents or the fact of their existence, and not the truth of the matters asserted in them. *In re XM Satellite Radio Holding Securities Litig.*, 479 F. Supp. 2d 165, 174 n.8 (D.D.C 2007) (in taking judicial notice of SEC filings, press releases, analyst reports and conference call transcripts, Court noted it would "consider these document to establish the content of the disclosures therein"); *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir. 2001) (court may take judicial notice of court records, but "not for the truth of the facts recited therein"); *Staehr v. Hartford Financial Services Group, Inc.,* 547 F.3d 406, 410 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits or regulatory filings contained certain information, without regard to the truth of their contents."); *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (taking judicial notice of SEC filing "only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents").

for leave to serve the requested discovery, and (2) a stay of this motion practice pending that discovery. While Plaintiffs believe the Motions can be denied on the present record for the reasons stated in Sections II and III, *infra*, we seek the above-described discovery in an abundance of caution.

## II.     THE U.S. ACCOUNTING ENTITIES ARE LIABLE FOR THE CONDUCT OF THE TRANSNATIONAL ACCOUNTING FIRMS

The Accounting Defendants are dismissive of the notion that these three accounting and consulting behemoths are actually transnational businesses at all, claiming instead that its affiliates are virtual strangers to each other—just loosely related mom and pop accounting shops. But that is not how they hold themselves out to the world, nor is it remotely in tune with the reality of how they operate. To the extent pertinent to the Motion, Plaintiffs would offer to replead, moreover, that each Moving Defendant has a set of global guidelines, protocols, and methodologies to maintain brand integrity. Although the specifics are not known, the quality control and standards require robust explanations and back up for not meeting reporting deadlines and making minor or major exceptions to audit reports.

It is axiomatic, under New York law (where two of the three Accounting Defendants have their principal places of business) as elsewhere,[17] that agency

---

[17] Similarly, corporations in Illinois are subject to vicarious liability for torts committed by their agents and employees. *See Zahl v. Krupa*, 399 Ill. App. 3d 993,

liability will arise when there is an "agreement between [a] principal and [an] agent that the agent will act for the principal and the principal retains a degree of control over the agent." *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003); *N.Y. Marine & Gen. Ins. Co. v. Tradeline, L.L.C.*, 266 F.3d 112, 122 (2d Cir. 2001) (quoting *Meese v. Miller,* 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 499 (1981)); *see also Maurillo v. Park Slope U–Haul*, 194 A.D.2d 142, 146, 606 N.Y.S.2d 243, 246 (1993). Although the element of control is deemed the essential characteristic of the principal-agent relationship control does not depend on whether the defendant actually controlled the affiliate, but rather whether the defendant had the **right to control** its conduct. *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005).

Indeed, in analogous circumstances, courts applying agency principles have held that claims were stated against transnational accounting firms, or, at the very least, that discovery should proceed on the limited question of the integration of the

---

1020, 927 N.E.2d 262 (2010). In New Jersey, "[a] corporation is liable for Torts committed by its agents within the course of employment and the fact that the agent is also a corporation is immaterial." *Mueller v. Seaboard Commercial Corp.*, 5 N.J. 28, 34, 73 A.2d 905 (1950) (citing Fletcher, Cyclopedia Corporations (Perm. Ed.) Vol. 10, ¶ 4877, p. 338; 19 C.J.S. Corporations, § 126o). "An agency relationship is created 'when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *N.J. Lawyers' Fund for Client Prot. v. Stewart Title Guar. Co.*, 203 N.J. 208, 220, 1 A.3d 632 (2010) (quoting Restatement (Third) of Agency, § 1.01).

accounting defendants. *See Parmalat*, 375 F. Supp. 2d at 290; *Cromer Finance Ltd. v. Berger*, 2002 WL 826847, at *4 (S.D.N.Y. May 2, 2002).

At the pleading stage, the case law does not require that Plaintiffs allege that the Moving Defendants were actually involved in performing the relevant audits. Rather, it requires only that the named defendants exercised some control over the affiliate firms' operations and audits generally. *See e.g.*, *Cromer*, 2002 WL 826847 at *2-3; *Parmalat*, 375 F. Supp. 2d at 287-88, 293-95. The court in *Cromer* held:

> [P]laintiffs sufficiently demonstrated Deloitte Touche Tomatsu's ("Deloitte") "participation in the audits based on an agency theory" when Deloitte conveyed to the public and organized itself as a global entity, the member firms used Deloitte's name and logo, and a member of Deloitte's global investment management team was the partner in charge of the member firm that signed the audit reports.

2002 WL 826847 at *2-3 (allowing plaintiffs to amend their complaint to compel defendants to respond to agency allegations).

Similarly, in *Parmalat*, the court upheld plaintiffs' allegations of vicarious liability against Deloitte and Grant Thornton International ("GTI"). The court noted that plaintiffs had alleged certain facts about the structural characteristics of Deloitte and GTI that allowed them to control the activities of their member firms. As to Deloitte, plaintiffs alleged that: (1) Deloitte marketed itself and its member firms as a global auditing firm and reported the revenue for all member firms on a combined basis; (2) member firms regularly cross checked each other's work to ensure quality; (3) member firms cooperated and joined together in submitting bids for audit

services; (4) member firms used the Deloitte name and logo; and (5) there was an overlap in senior officers between Deloitte and its member firms. *See Parmalat*, 375 F. Supp. 2d at 287-88, 293. As to GTI, the court found similar facts to hold it vicariously liable: (1) GTI marketed itself as a global accounting organization; (2) GTI required its member firms to follow certain auditing policies and procedures; (3) GTI reviewed each member firm every three years to ensure compliance; and (4) GTI could discipline member firms (including expulsion) for failure to comply with its policies and procedures. *Id.* at 288, 299-300. The court refused to make the ultimate factual determination on a motion to dismiss "[w]hether this was simple collaboration *or* an agency relationship." *Id*. at 294-295 (emphasis added).

Here, as in *Cromer* and *Parmalat*, Plaintiffs' factual allegations are more than sufficient, for pleading purposes, to establish agency relationships among the two transnational accounting firms. The Accounting Defendants should be held jointly liable with their affiliates for issuing fraudulently inflated financial statements of BDL and Byblos. The Accounting Defendants cannot hold themselves out as constituting an integrated international accounting and consulting practice, with uniform standards of quality across the globe, so as to entice clients, and then deny that fact so as to avoid liability. Plaintiffs have alleged that the Accounting Defendants acted as single entities. ¶¶ 41-42. Indeed, the Accounting Defendants concede as much themselves on their own websites, touting the global resources

19

available to clients across the globe.

Here, as in *Cromer* and *Parmalat*, Plaintiffs allege sufficient facts to demonstrate that the "local" affiliates acted as agents of the global parents sufficient for pleading purposes, and to subject the Accounting Defendants to discovery concerning the agency relationships within their consortiums, as well as the involvement of these entities in the conduct at issue.

No doubt, Defendants have cited contrary cases in which courts have rejected claims that affiliates of major accounting firms may be jointly liable under various vicarious liability principles. But the *Cromer* and *Parmalat* decisions are better reasoned, and more consistent with jurisprudence relating to other types of multinational businesses.

## III. PLAINTIFFS HAVE STATED ACTIONABLE CLAIMS AGAINST THE TRANSNATIONAL ACCOUNTING FIRMS

### A. Plaintiffs Have Pleaded Actionable Claims of Aiding and Abetting Fraud

In Counts IX and XI, Plaintiffs have pleaded claims of aiding and abetting fraud against the Accounting Defendants. The modern application of the tort of aiding and abetting can be traced to the Restatement (Second) of Torts Section 876(b). Section 876 provides, "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . (b) knows that the others' conduct constitutes a breach of duty and gives substantial assistance or

encouragement to the other so to conduct himself[.]" Liability for aiding and abetting fraud has long been recognized in New York, Illinois,[18] New Jersey,[19] and in the vast majority of U.S. jurisdictions. New York law requires the plaintiff to "allege (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of the violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong." *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983).

It is hardly unusual for courts to sustain aiding and abetting claims against accountants where they are alleged to have provided "substantial assistance" to a client engaging in fraud. *See, e.g.*, *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 495 (S.D.N.Y. 2003) (sustaining claim of aiding and abetting fraud against auditor under New York common law where auditor failed to make complete disclosures to IRS);

---

[18] In Illinois, to state a claim for aiding and abetting fraud, a plaintiff must show the defendant (i) aided a party who performed a wrongful act that caused an injury, (ii) regularly knew of its role as part of the overall tortious activity when the defendant provided its assistance, and (iii) knowingly and substantially assisted the principal violation. *See Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 27-28 (2003).
[19] In New Jersey, similarly, liability arises where one party "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Judson v. Peoples Bank & Trust Co.*, 25 N.J. 17, 29, 134 A.2d 761 (1957) (internal citations omitted); *see also Franklin Med. Assocs. v. Newark Pub. Schs.*, 362 N.J. Super. 494, 510, 828 A.2d 966 (App. Div. 2003) (person who bribes an agent of a principal has "aided and abetted" the agent in the breach of the agent's fiduciary duty of loyalty to the principal).

*In re Integrity Ins. Co.*, 240 N.J. Super. 480, 502-03, 573 A.2d 928 (App. Div.1990) (company liquidator filed claims against the company's auditor alleging fraud, aiding and abetting fraud and other claims for the auditor's participation in concealing the company's true economic condition by preparing and disseminating materially false financial statements).

Here, the Accounting Defendants provided "substantial assistance" to BDL and the Commercial Banks in implementing their fraudulent scheme to defraud depositors, as the scheme could not have gotten off the ground, much less lasted four years, without their involvement. As explained in the forensic accounting report of M&A, the financial statements of BDL were inaccurate for five years, from 2015 to 2020. The reality was that BDL had a growing shortage of dollars on hand, and no plausible ability to repay its obligations to the Commercial Bank Conspirators, but was continuing to give out IOUs to the commercial banks who continued to deliver to BDL new money from new depositors. The IOUs, of course, were worthless. This also rendered the financial statements of the commercial banks, such as Byblos, inaccurate, as the IOUs from BDL to the commercial banks (the largest assets on their balance sheets) were simply uncollectible and worthless.

And the Accounting Defendants obviously had "knowledge" of the fraudulent scheme, the existence of which is chronicled in A&M's forensic audit report, and is not seriously contested. EY and Deloitte knew this as accountants to BDL—as such

they obviously knew of the ballooning and unpayable obligations from BDL to the commercial banks, and the uncollectible IOUs to BDL from the Lebanese government. All of the Accounting Defendants also knew this as accountants to many of the Commercial Bank Conspirators. Plaintiffs have pleaded that EY and BDO are liable for their conduct as auditor to Byblos, and it is a matter of public record that EY and BDO were  also auditors to other Commercial Bank Conspirators, and that Deloitte was auditor to several of the Commercial Bank Conspirators as well.[20]

## B.    Plaintiffs Have Pleaded Actionable Claims of Negligence

In Counts VIII and X, Plaintiffs have pleaded claims of negligence against the Accounting Defendants. The elements of a negligence claim under New York law (which are similar to those applicable in other jurisdictions) are: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 215

---

[20] In addition to being auditors for Byblos, EY also audited Commercial Bank Defendants Bank Audi and Societe Generale De Banque au Liban SAL, and certain of the nonparty coconspirators. Deloitte audited Commercial Bank Defendants Banque Libano Francaise SAL, Fransabank SAL and Bank of Beirut Invest SAL, as well as certain of the nonparty coconspirators. BDO, in addition to auditing Byblos, also audited Bank Audi, Blom Bank, Societe Generale De Banque au Liban SAL, and certain of the nonparty coconspirators. *See* Association des Banques du Liban (ABL), *Almanac of Banks in Lebanon 2022*, available at https://www.abl.org.lb/Library/Assets/Gallery/Documents/ABL%20Almanac%202022%20N.pdf.

(2d Cir. 2002) (citing *Merino v. New York City Transit Auth.*, 218 A.D.2d 451, 639 N.Y.S.2d 784 (1996)).

Professionals may be liable to nonclients for negligence when it can be reasonably expected that the third persons will rely on the professional's conduct. The Restatement (Second) of Torts (1977) provides that "[o]ne who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. *Id.* § 552(1). Under New York law, such liability arises where: [i] the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; [ii] in the furtherance of which a known party or parties was intended to rely; and [iii] there must have been some conduct on the part of  the accountants linking them to  that  party  or  parties,  which  evinces  the accountants' understanding of that party or parties' reliance." *Credit Alliance Corp.* v. *Arthur Andersen & Co.*, 65 N.Y.2d 536, 551 (1985).

There has been considerable litigation applying the *Credit Alliance* standard, and many state and federal courts applying New York law (and other state law) have sustained negligence claims brought by third parties against auditors. *See, e.g.*, *AUSA Life Ins. Co. v. Dwyer*, 928 F Supp 1239, 1277 (S.D.N.Y. 1996) (denying

summary judgment); *Abbott v. Herzfeld & Rubin, P.C.*, 202 A.D.2d 351, 351-52, 609 N.Y.S.2d 230 (1994), *appeal dismissed, in part, appeal denied, in part*, 83 N.Y.2d 995, 640 N.E.2d 142 (1994).

All three Accounting Defendants invoke New Jersey's Accountants Liability Act, N.J.S.A. 2A:53A-25(b), which places certain limitations on the liability of accountants that are more stringent than those applicable under New York law, or in the vast majority of other jurisdictions. There is, however, little or no nexus between New Jersey and the work of the accountants in this case, and New York and Illinois have a more significant relationship to the transactions at issue.

Here, Plaintiffs were all U.S. depositors with Lebanese commercial banks who would have been expected to rely on the financial reports of the commercial banks themselves, and also on the financial reports of BDL. Under the "financial engineering" scheme implemented by BDL and the commercial banks, the two levels of financial reporting were closely integrated. If BDL was failing and its financial results inflated, the receivables that were the largest assets on the financial statements of the commercial banks would also be improperly valued. This was obviously known to Deloitte and EY, both as auditors of BDL, and as auditors of several of the Commercial Bank Conspirators, and to BDO, as auditors of Byblos and other Commercial Bank Conspirators.

25

**C.**     <u>**Plaintiffs Have Pleaded an Actionable Claim of Unjust Enrichment**</u>

In order to adequately plead a cause of action for unjust enrichment, it must be alleged that the defendant was enriched, at the plaintiff's expense, and that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered. *See Mandarin Trading v. Wildenstein*, 16 N.Y.3d 173, 182 (2011). The elements are similar in other jurisdictions. *See* Restatement (Third) of Restitution and Unjust Enrichment, § 1 ("A person who is unjustly enriched at the expense of another is subject to liability in restitution.")

Here, the Accounting Defendants facilitated fraud and other inequitable conduct by their clients through which BDL and the Commercial Bank Conspirators conspired to fraudulently induce American depositors to deposit their funds with the Commercial Bank Conspirators. Both Deloitte and EY are responsible for generating five years of inaccurate audits of BDL, which allowed BDL and the Commercial Bank conspirators to perpetuate their fraudulent scheme. If the true financial condition of BDL had been disclosed earlier, the scheme would have ended and depositors such as Plaintiffs would not have lost their deposits. EY is also responsible to depositors of Byblos for generating inaccurate audits of Byblos, which permitted Byblos to publish a misleading depiction of its financial condition.

Under these circumstances it would be "against equity and good conscience" for the Accounting Defendants to retain the compensation they received for their

engagements with BDL and with the Commercial Bank Coconspirators.

**D.    RICO**

Plaintiffs did not intend to assert Count I as against the Accounting Defendants, none of whom are identified as members of the operative RICO enterprise described in some detail in the body of Count I. The participants in the RICO enterprise are described as the Commercial Bank Conspirators (a term encompassing those Lebanese commercial banks named as defendants, and other Lebanese commercial bank identified as non-party co-conspirators), and Defendants BDL and Riad Salameh. ¶ 123. Due to a typographical error in the header, Count I was styled as being asserted against "all Defendants," however, Plaintiffs intended to assert that claim only against BDL, Salameh and the Commercial Bank Defendants. Accordingly, Plaintiffs do not oppose dismissal of Count I as to the Accounting Defendants.

**CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that Defendants' Motions be denied.[21]

---

[21] In the event the Court grants Defendants' Motions for any reason, Plaintiffs respectfully request leave to amend. *See, e.g.*, *In re Synchronoss Techs., Inc. Sec. Litig.*, 2020 WL 3118749, at *7 & n.6 (D.N.J. Jun. 12, 2020). While Plaintiffs have amended their complaint once, it was only to add additional parties and it did not materially change the factual allegations or claims asserted.

Dated: January 27, 2025

CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C

/s/   *James E. Cecchi*         _
James E. Cecchi
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

Charles J. LaDuca*
Daniel M. Cohen*
Monica Miller*
CUNEO GILBERT & LADUCA, LLP
2445 M Street N.W., Suite 740
Washington, DC 20037
Telephone: 202-789-3960
charles@cuneolaw.com
daniel@cuneolaw.com
monica@cuneolaw.com

Robert K. Shelquist*
Rebecca A. Peterson*
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Telephone: 612-339-6900
rkshelquist@locklaw.com
rapeterson@locklaw.com

John W. ("Don") Barrett*
Katherine Barrett Riley*
BARRETT LAW GROUP, P.A.
404 Court Square North, P.O. Box 927
Lexington, Mississippi 39095
Telephone: (662) 834-2488
donbarrettpa@gmail.com
kbriley@barrettlawgroup.com

***Counsel for Plaintiffs and the Classes***
    *Pro hac vice to be filed*

28