## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KARIM P. NAJJAR, *et al.*, *individually and on behalf of all others similarly situated*,

       *Plaintiffs*,

     v.

RIAD SALAMEH, *et al.*,

       *Defendants*.

No. 24-cv-05043

**OPINION**

**APPEARANCES:**

**Jason Henry Alperstein**
**James E. Cecchi**
CARELLA BYRNE CECCHI OLSTEIN
BRODY & AGNELLO
5 Becker Farm Road
Roseland, NJ 07068

   *On behalf of Plaintiffs*

**James Figorski**
**Michael H. McGinley** (*pro hac vice*)
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104

**Gary J. Mennitt** (*pro hac vice*)
**Tamer H. Mallat** (*pro hac vice*)
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036

   *On behalf of Defendant Banque du Liban*

**Jennifer M. Rosa**
**Mark G. Hanchet** (*pro hac vice*)
**Robert W. Hamburg** (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas

New York, NY 10020

*On behalf of Defendant BLOM Bank, S.A.L.*

**Michael D. Hynes**
DLA PIPER LLP
1251 Avenue of the Americas
27th Floor
New York, NY 10020

**John J. Hamill** (*pro hac vice*)
**Pamela B. Loutos** (*pro hac vice*)
**Noah A. Smith** (*pro hac vice*)
DLA PIPER LLP
444 W. Lake Street
Suite 900
Chicago, IL 60606

*On behalf of Defendants Bank Audi, S.A.L., BankMed, S.A.L., Bank of Beirut, S.A.L., and Byblos Bank, S.A.L.*

**O'HEARN, District Judge.**

## INTRODUCTION

This matter comes before the Court on the Motion to Dismiss filed by Defendant Banque du Liban ("BDL"), (ECF No. 115), as well as the Motion to Dismiss filed by Defendants Bank Audi, S.A.L. ("Audi"), BLOM Bank, S.A.L. ("BLOM"), BankMed, S.A.L. ("BankMed"), Bank of Beirut, S.A.L. ("Bank of Beirut"), and Byblos Bank, S.A.L. ("Byblos") (collectively, "Commercial Banks," and together with BDL, "Defendants"), (ECF No. 116). The Court did not hear oral argument pursuant to Local Rule 78.1. For the reasons that follow, both Motions to Dismiss, (ECF Nos. 115–16), are GRANTED without prejudice, and without leave to amend.

## I.    BACKGROUND

This case arises from the collapse of Lebanon's banking system and the resulting loss of access to U.S. dollar deposits that the U.S.-based Plaintiffs claim they entrusted to various Lebanese banks. Plaintiffs allege that BDL and the Lebanese Commercial Banks orchestrated and sustained a scheme to attract, retain, and ultimately trap those deposits through false assurances and unsustainable financial practices.

The Court begins by summarizing the parties and then turns to the Amended Complaint's allegations regarding the structure and operation of the alleged scheme.

### A.    The Defendants

BDL is the central bank of Lebanon. (Am. Compl., ECF No. 3 at ¶ 27). It is a public entity established by Lebanon's Code of Money and Credit in 1963. (*Id.*). BDL oversees all banking operations within Lebanon, acts as a banker for the Lebanese Government, and maintains accounts for various other institutional financial actors, including the Commercial Banks. (Naddour Decl., ECF No. 115-2 at ¶ 8). BDL does not have any offices or employees in the United States and is

alleged to be a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA" or "Act"), 28 U.S.C. § 1603. (*Id.* ¶ 20; Am. Compl., ECF No. 3 at ¶¶ 12, 27).

The Commercial Banks—Audi, BLOM, BankMed, Bank of Beirut, and Byblos—are Lebanese banking entities each with a principal place of business in Lebanon. (Am. Compl., ECF No. 3 at ¶¶ 29–31, 33–34). They are all alleged to have held substantial foreign currency deposits at BDL between 2015 and 2020 and to have participated in the broader scheme which forms the basis for the claims in this action. (*Id.* ¶ 39). None of the Commercial Banks have any agencies, branches, offices, or employees in New Jersey. (*See* Commercial Banks' Exs. 2–6, ECF Nos. 116-4–8).

## B. The Plaintiffs

A total of ten Plaintiffs are named in the Amended Complaint.[1] Two of the Plaintiffs are New Jersey residents: Dr. Karim P. Najjar ("Dr. Najjar") is a New Jersey resident and a depositor with Byblos, (Am. Compl., ECF No. 3 at ¶ 22); and Samar Shami ("Shami") is a New Jersey resident and a depositor with BLOM, BankMed, and Bank of Beirut, (*id.* ¶ 24).

There are eight Plaintiffs who are not New Jersey residents: Halim Abou-Faycal ("Abou-Faycal") is a Louisiana resident and a depositor with BLOM, (*id.* ¶ 17); Younes Bazzi ("Bazzi") is a Michigan resident and a depositor with Audi, (*id.* ¶ 18); Jacques Fontaine ("Fontaine") is a Florida resident and a depositor with Audi, (*id.* ¶ 19); Mounir Jermany ("Jermany") is a Massachusetts resident and a depositor with Byblos and BLOM, (*id.* ¶ 20); Ibrahim Khreibani ("Khreibani") is a Texas resident and a depositor with Fenicia Bank, S.A.L., (*id.* ¶ 21); Bechara Rizk ("Rizk") is a Virginia resident and a depositor with Byblos, (*id.* ¶ 23); Joseph Tleiji ("Tleiji")

---

[1] The Court refers to all of the individuals identified within this subsection collectively as "Plaintiffs," unless otherwise noted.

2

is a New York resident and a depositor with Byblos and BankMed, (*id.* ¶ 25); and Ramzi Zibaoui ("Zibaoui") is an Arizona resident and a depositor with BankMed, (*id.* ¶ 26).[2]

### C. The Alleged Scheme

After Lebanon pegged its currency to the U.S. dollar in the 1990s, the country's economy became heavily reliant on foreign currency inflows. (*Id.* ¶¶ 5–6). Plaintiffs allege that Lebanese banks then offered "remarkably" high interest rates to attract deposits, particularly from the Lebanese population living abroad. (*Id.* ¶¶ 6–8, 47–55). Those rates, however, were unsustainable. (*Id.* ¶ 50). According to the Amended Complaint, by 2015 foreign remittances and dollar liquidity had declined, placing the Lebanese banking system under severe strain. (*Id.* ¶¶ 6–8, 46–53).

Beginning in 2016, BDL allegedly responded to this predicament with a "financial engineering" program that offered the Commercial Banks substantial returns on fresh U.S. dollars brought in from depositors. (*Id.* ¶¶ 52–54, 102). The Commercial Banks, in turn, allegedly offered exorbitant rates to attract new dollar deposits and to induce existing depositors to keep their funds in Lebanon. (*Id.* ¶¶ 54–58, 69, 75, 87–89).

The Amended Complaint characterizes BDL as the "architect" of the scheme. (*Id.* ¶ 46). Plaintiffs allege that BDL and the Commercial Banks concealed the deteriorating condition of Lebanon's financial system while continuing to solicit deposits, despite knowing the system could not sustain the promised returns. (*Id.* ¶¶ 56–58, 67, 75–77, 88–89). They further allege that the

---

[2] Plaintiffs' pleadings and briefing are not entirely clear as to which Plaintiffs and allegations they rely upon in opposing the Motions. In their opposition to the Commercial Banks' Motion, for example, Plaintiffs discuss facts concerning only four plaintiffs—Dr. Najjar, Shami, Jermany, and Zibaoui. (ECF No. 124 at 13–17). Moreover, at least one plaintiff, Khreibani, appears to only have asserted claims against a previously dismissed defendant, Fenicia Bank, S.A.L. (*See* ECF No. 100). Finally, the Amended Complaint lists "Salim Tleiji" in its opening paragraph, but otherwise contains no specific factual allegations concerning a plaintiff with that name. (*See* ECF No. 3 at 1). All that said, the Court has considered the allegations of all Plaintiffs to the extent their claims remain live and those allegations bear on the issues presented.

scheme specifically targeted persons of Lebanese descent living abroad, especially United States citizens and residents, through phone calls, emails, WhatsApp messages, and calls directed to persons in the United States. (*Id.* ¶¶ 55, 86, 129).

Plaintiffs further allege that depositors were repeatedly assured that their funds were safe and accessible even though BDL and the Commercial Banks knew the system lacked sufficient foreign currency backing and was approaching collapse. (*Id.* ¶¶ 67, 75, 81–83, 125). By mid-2019, the Commercial Banks were allegedly colluding with BDL to impose unlawful and discriminatory capital controls and withdrawal restrictions on U.S. dollar deposits. (*Id.* ¶¶ 77–80, 88).

The Amended Complaint places the practical collapse of the Lebanese banking system in 2019, when Lebanon's liquidity crisis worsened and the Commercial Banks blocked or severely restricted depositors' access to U.S. dollars and transfers abroad. (*Id.* ¶¶ 77–83). Plaintiffs allege that, even as the crisis intensified, the banks continued to encourage new deposits and falsely represented that depositors' funds remained safe and recoverable. (*Id.* ¶¶ 75–77, 83). Depositors who converted dollars into Lebanese currency were allegedly left with nearly worthless local currency, while those who retained dollar deposits could not access them inside or outside Lebanon. (*Id.* ¶¶ 71–74, 81–82).

The Plaintiffs allege that they each deposited substantial sums, often by wire transfer from U.S. bank accounts, and that they were induced by high interest rates and related representations to place or retain funds in Lebanon. (*Id.* ¶¶ 17–26, 55, 69, 86–90). Several Plaintiffs further allege that bank personnel continually communicated with them while they were in the United States and urged them either to make new deposits or to refrain from withdrawing existing funds. (*Id.* ¶¶ 17–19, 22–24, 55, 89, 91–92). Once the crisis became acute, Plaintiffs allege they were unable to withdraw their money or transfer it out of Lebanon. (*Id.* ¶¶ 21–26, 73, 77–84, 88–89, 159, 165–

170, 176–178, 181–185, 191–193). Plaintiffs also allege that the banks maintained correspondent bank accounts in New York to facilitate U.S. dollar transactions. (*Id.* ¶¶ 48, 90).

Based on these allegations, Plaintiffs bring this putative class action, asserting the following claims against BDL and the Commercial Banks: Count 1 asserts violations under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c) and (d), against all Defendants; Count Two asserts common-law fraud against the Commercial Banks; Count Three asserts civil conspiracy to commit fraud against all Defendants; Count Four asserts breach of contract against the Commercial Banks; Count Five asserts conversion against all Defendants; Count Six asserts unjust enrichment against all Defendants; and Count Seven asserts promissory estoppel against the Commercial Banks.[3]

## II.    PROCEDURAL HISTORY

On April 16, 2024, Plaintiffs filed their Complaint. (ECF No. 1). They filed the Amended Complaint on July 23, 2024. (ECF No. 3). On June 10, 2025, the Court dismissed defendants BDO USA, P.C., Deloitte, LLP, Deloitte & Touche, LLP, and Ernst & Young U.S. LLP. (Op. & Order, ECF Nos. 66–67). As the case progressed, Plaintiffs also voluntarily dismissed without prejudice several other defendants named in the Amended Complaint. (*See* ECF Nos. 84 (dismissing Deloitte Touche Tohmatsu Limited and Ernst & Young Global Limited), 100 (dismissing Fenicia Bank, S.A.L.), 101 (dismissing Credit Libanais S.A.L., Fransabank S.A.L., Banque Libano-Française, and Société Générale de Banque au Liban)). BDL and the Commercial Banks are the only remaining defendants.

---

[3]   Counts Eight through Eleven are alleged against accounting firm defendants who have already been dismissed from this lawsuit.

The Court ordered bifurcated briefing on the motions to dismiss to be filed by BDL and the Commercial Banks. (ECF Nos. 93, 99). At the first stage of the briefing, which is presently before the Court, briefing was limited to procedural and jurisdictional issues. (*See id.*). On September 18, 2025, BDL moved to dismiss the Amended Complaint pursuant to the FSIA and Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(5). (ECF No. 115). That same day, the Commercial Banks moved to dismiss under Rule 12(b)(2) and on *forum non conveniens* grounds. (ECF No. 116). Plaintiffs timely opposed both motions. (ECF Nos. 124–25).

### III.   LEGAL STANDARDS

#### A.  Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) must be granted if the Court lacks subject-matter jurisdiction. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012); *see* FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Indeed, "federal courts have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 267 (3d Cir. 2016) (quotation marks and citation omitted). A plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *Lightfoot v. United States*, 564 F.3d 625, 627 (3d Cir. 2009).

A motion under Rule 12(b)(1) may lodge a facial or factual attack on a court's subject-matter jurisdiction. *E.g.*, *Young v. United States*, 152 F. Supp. 3d 337, 345 (D.N.J. 2015) (citing *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008)). A facial attack "concerns an alleged pleading deficiency whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *Id.* (citations omitted). In a facial attack, "the court looks only at the allegations in the pleadings and does so in the light most favorable to

6

the plaintiff." *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007) (citations omitted). In a factual attack, "it is permissible for a court to review evidence outside the pleadings." *Id.* (citations omitted).

### B. Rule 12(b)(2)

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff "bears the burden of demonstrating the facts that establish personal jurisdiction[.]" *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). The Court's exercise of personal jurisdiction must comport with both the forum state's long-arm statute and the Due Process Clause of the federal Constitution. *IMO Indus., Inc. v. Kiekert, AG*, 155 F.3d 254, 259 (3d Cir. 1998). In New Jersey, the statutory and constitutional analyses collapse into one because "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004) (citing N.J. Cᴛ. R. 4:4-4(c)).

When a court "resolves the jurisdictional issue in the absence of an evidentiary hearing and without the benefit of discovery, the plaintiff need only establish a prima facie case of personal jurisdiction." *Otsuka Pharm. Co. v. Mylan Inc.*, 106 F. Supp. 3d 456, 461 (D.N.J. 2015). In such cases, a court takes "the uncontroverted allegations in the plaintiff's complaint as true and resolve[s] any factual conflicts in the affidavits and other written materials in the plaintiff's favor." *Id*. (internal punctuation and quotations omitted).

Still, the plaintiff "'bears the burden to prove, by a preponderance of the evidence,' that personal jurisdiction is proper." *Cerciello v. Canale*, 563 F. App'x 924, 925 n.1 (3d Cir. 2014) (quoting *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992)). In assessing personal jurisdiction, "[w]hile disputed issues are construed in favor of the plaintiff, allegations

may be contradicted by the defendant through opposing affidavits or other evidence, at which point the plaintiff must respond with 'actual proofs, not mere allegations.'" *Am. Bd. of Internal Med. v. Rushford*, No. 14-06428, 2015 WL 5164791, at *2 (D.N.J. Sept. 2, 2015) (quoting *Patterson v. FBI*, 893 F.2d 595, 603 (3d Cir. 1990)).

## IV.    DISCUSSION

BDL and the Commercial Banks each move to dismiss on multiple grounds. The Court will address their respective Motions in turn.

For the reasons set forth below, both Motions are granted. BDL is entitled to dismissal on foreign sovereign immunity grounds, and the claims against the Commercial Banks will be dismissed for lack of personal jurisdiction. Plaintiffs' alternative requests for jurisdictional discovery, raised in opposition to each Motion, are denied.

### A.  BDL's Motion

BDL moves to dismiss based on: (1) improper service; (2) sovereign immunity under the FSIA; (3) the act of state doctrine; (4) *forum non conveniens*; and (5) improper venue. (ECF No. 115-1 at 7). Because each of these is a threshold, non-merits ground for dismissal, the Court "has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)). Here, the Court will dismiss the claims against BDL for lack of subject-matter jurisdiction because BDL is entitled to sovereign immunity under the FSIA.

      1.  <u>BDL is Entitled to Sovereign Immunity Under the FSIA Because the Commercial Activity Exception Does Not Apply.</u>

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in federal court[.]" *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). Under

the Act, a foreign state—including its "political subdivision[s]" and "agenc[ies] or instrumentalit[ies]"—is presumptively immune from suit unless a statutory exception applies. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); 28 U.S.C. §§ 1603(a)–(b).

To be entitled to that presumption, a defendant must first make a *prima facie* showing that it qualifies as a "foreign state" under the Act; once shown, the burden shifts to the plaintiff to show that an exception to immunity applies. *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1285 (3d Cir. 1993); *Richardson v. Donovan*, 673 F. App'x 246, 249 (3d Cir. 2016). If no exception applies, the Court lacks subject-matter jurisdiction. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 489 (1983).

Here, Plaintiffs admit that BDL is an "agency or instrumentality" of a foreign state.[4] (Am. Compl., ECF No. 3 at ¶ 12). BDL is thus presumptively immune from suit, and Plaintiffs bear the burden of establishing an applicable FSIA exception in order for subject-matter jurisdiction to exist.

The only FSIA exception at issue here is the commercial activity exception. *See* 28 U.S.C. § 1605(a)(2). Section 1605(a)(2) sets out three paths by which a court may exercise jurisdiction

---

[4] In arguing for the applicability of the commercial activity exception, Plaintiffs argue that the burden of proof is on BDL as the party claiming immunity. (Pls.' Opp. Br., ECF No. 125 at 17–19). It is true that, despite the burden shifting framework under the FSIA, the foreign state "bears the ultimate burden of persuasion" to prove immunity. *City of New York v. Permanent Mission of India to the U.N.*, 446 F.3d 365, 369 (2d Cir. 2006), *aff'd and remanded*, 551 U.S. 193 (2007). However, the "party seeking to establish jurisdiction bears the burden of producing evidence establishing that a specific exception applies[.]" *Id.* Plaintiffs' argument, in this regard, amounts to a request for jurisdictional discovery "[t]o the extent [BDL] challenges the accuracy of th[e] factual allegations." (Pls.' Opp. Br., ECF No. 125 at 18). The Court addresses that request below.

over claims arising from a foreign state's "commercial activity."[5] *See id.* Here, Plaintiffs rely only on the third path.[6] (*See* Pls.' Opp. Br., ECF No. 125 at 19–21).

Regardless of path taken, each of Section 1605(a)(2)'s three clauses requires Plaintiffs to plausibly allege that BDL engaged in "commercial activity" within the meaning of the Act. The FSIA defines "commercial activity" as either "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Whether an activity is "commercial" turns on its nature, not its purpose. *Id.* The central question is whether the foreign state acted as a market regulator or instead as a private participant in the market. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992); *Ezeiruaku v. Bull*, No. 14-2567, 2014 WL 5587404, at *4 (D.N.J. Nov. 3, 2014), *aff'd*, 617 F. App'x 179 (3d Cir. 2015) (per curiam). Put differently, a foreign state engages in "commercial activity" when it exercises powers that private parties can also exercise, rather than powers "peculiar to sovereigns." *Nelson*, 507 U.S. at 360 (quoting *Weltover*, 504 U.S. at 614).

Here, the Amended Complaint alleges no facts suggesting that BDL engaged in commercial activity within the meaning of the FSIA. Plaintiffs' principal theory is that BDL worked with the Commercial Banks to impose capital controls and block withdrawals and transfers of U.S. dollars

---

[5] In full, the commercial activity exception precludes "foreign state" immunity "in any case":

> in which the action is based upon [1] a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2).

[6] Plaintiffs' opposition brief asserts that the "second clause" in Section 1605(a)(2) applies yet quotes the third clause. (*See* ECF No. 125 at 19). The Court presumes this is a clerical error and thus construes Plaintiffs as invoking the third clause given the quoted language in Plaintiffs' brief.

out of Lebanon. (*See* Am. Compl., ECF No. 3 at ¶¶ 78, 81-82, 88, 91, 165-170). But when a foreign central bank acts to preserve exchange stability and allocate scarce foreign currency reserves during a shortage, it acts in a sovereign, not commercial, capacity. *See De Sanchez v. Banco Cent. Nicaragua*, 770 F.2d 1385, 1387, 1393 (5th Cir. 1985) (finding "regulation and supervision of a nation's foreign exchange reserves" to be "sovereign activity"); *Weltover*, 504 U.S. at 614 (describing "the issuance of regulations limiting foreign currency exchange" as sovereign activity "because such authoritative control of commerce cannot be exercised by a private party"). These allegations therefore fail to amount to commercial activity under the FSIA.

Plaintiffs' remaining allegations as to BDL's supposed role in attracting and retaining U.S. dollar deposits fail for similar reasons. They allege that BDL worked with the Commercial Banks to offer higher interest rates, project financial strength, and discourage withdrawals, while the Commercial Banks' personnel targeted U.S. citizens through calls, messages, and emails. (Am. Compl., ECF No. 3 at ¶¶ 55, 57-59, 86-89, 125, 128, 135, 143). But those solicitation allegations principally concern conduct by the Commercial Banks. Indeed, unlike the Commercial Banks, the Amended Complaint does not allege that BDL communicated with any of the Plaintiffs, opened accounts for them, accepted deposits from them directly, or made plaintiff-specific representations. Without such allegations, Plaintiffs cannot establish that BDL engaged in "commercial activity" to establish FSIA jurisdiction. *See Elghossain v. Bank Audi S.A.L.*, No. 21-2162, 2023 WL 6390160, at *12 (S.D.N.Y. Sept. 29, 2023) (finding it "clearly correct" that the commercial activity exception did not apply where "the Amended Complaint pleads no facts showing any communication or transaction between Plaintiffs and Banque du Liban.").

In short, Plaintiffs have not alleged that BDL engaged in any "commercial activity" so as to rebut BDL's presumptive immunity under the FSIA. The Court therefore lacks subject-matter jurisdiction over Plaintiffs' claims against BDL, and the Court will grant BDL's Motion to Dismiss.

2.    Jurisdictional Discovery is Not Warranted.

"District courts have the authority to allow discovery in order to determine whether subject-matter jurisdiction exists." *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 108 (3d Cir. 2015). That being the case, the Third Circuit has not squarely addressed whether and to what extent subject-matter jurisdictional discovery is available to explore questions implicating sovereign immunity. *But see Federal Insurance*, 12 F.3d at 1284 n.11 (noting "agree[ment] with other courts of appeals that sovereign immunity is a 'critical preliminary determination' of subject matter jurisdiction for which the parties should be granted a fair opportunity to engage in jurisdictional discovery"). To be sure, the issue of discovery in this context is complicated by the fact that the very purpose of sovereign immunity generally is "to shield a government defendant from the burdens of defending the suit, including the burdens of discovery." *Wright v. N.J. Dep't of Educ.*, 115 F. Supp. 3d 490, 498 n.2 (D.N.J. 2015). That concern is all the more delicate in the foreign-sovereign context, where "matter[s] of international grace and comity" are concerned. *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 204 (2019).

Indeed, as one court put it, "a tension exists between 'permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery.'" *Crist v. Republic of Turkey*, 995 F. Supp. 5, 12 (D.D.C. 1998) (quoting *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992)). To account for that tension, courts have generally permitted jurisdictional discovery only where it is genuinely possible that the plaintiff could establish facts sufficient to support

12

jurisdiction; where discovery would be futile, it should be denied. *Id.* Courts likewise require more than conclusory assertions: the plaintiff must identify non-conclusory allegations that, if supplemented through discovery, could materially affect the FSIA analysis. *Id.*

Here, jurisdictional discovery would be futile because no additional facts could alter the Court's conclusion that it lacks jurisdiction over the claims against BDL. As explained above, the FSIA requires Plaintiffs to plead "commercial activity" within the meaning of the Act. But the only allegations directly against BDL concern conduct it allegedly undertook in its sovereign capacity as a regulator of the Lebanese banking system, not as a market participant. On those allegations, "[t]here is no amount of discovery that will change these facts." *Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268, 274 (D.D.C. 2008). Therefore, Plaintiffs' request for jurisdictional discovery will be denied.

****

BDL is presumptively immune from suit under the FSIA, and Plaintiffs have not alleged facts sufficient to bring their claims within the Act's "commercial activity" exception. Nor have Plaintiffs shown that jurisdictional discovery would cure that deficiency. The Court therefore lacks subject-matter jurisdiction over the claims against BDL, and BDL's Motion to Dismiss will accordingly be granted.

### B.  The Commercial Banks' Motion

The Commercial Banks move to dismiss on grounds of lack of personal jurisdiction and, alternatively, *forum non conveniens*. (*See* ECF No. 116-2 at 9). Plaintiffs again request jurisdictional discovery if the Court finds for the Commercial Banks on personal jurisdiction.

For the reasons that follow, the Court finds that it lacks personal jurisdiction over the Commercial Banks. The Court will also again deny Plaintiffs' request for jurisdictional discovery.

1.    The Court Lacks Personal Jurisdiction Over the Commercial Banks.

Plaintiffs assert that this Court has specific personal jurisdiction over the Commercial Banks for each of their claims. (*See* Pls.' Opp. Br., ECF No. 124 at 23).

It is well-established that, for personal jurisdiction to exist, a defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotations omitted). For specific personal jurisdiction, the inquiry has three parts: first, the defendant must have "purposefully directed [its] activities" at the forum; second, the litigation must "arise out of or relate to" at least one of those activities; and third, if those requirements are satisfied, the court must consider whether exercising jurisdiction would "comport with fair play and substantial justice[.]" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 476 (1985) (quotations and citations omitted).

The specific jurisdiction inquiry is "shaped by the nature of the claims." *Murphy v. Eisai, Inc.*, 503 F. Supp. 3d 207, 222 n.11 (D.N.J. 2020). "Although the 'usual practice' is to determine specific jurisdiction on a claim-by-claim basis," where the claims all "stem from the same sequence of events and factual allegations," a claim-specific analysis is not required. *Grant Indus., Inc. v. Isaacman*, No. 21-13094, 2022 WL 2358422, at *10 n.12 (D.N.J. June 30, 2022). In any event, for contract-sounding claims the relevant inquiry is whether "the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach." *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001). For tort-like claims, the inquiry requires "a closer and more direct causal connection than that provided by the but-for test." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 323 (3d Cir. 2007). Intentional torts require even more; that "the defendant must have expressly aimed [their] tortious conduct at the forum, such that the forum can

14

be said to be the focal point of the tortious activity." *IMO Industries*, 155 F.3d at 256 (interpreting *Calder v. Jones*, 465 U.S. 783 (1984)).

Here, none of Plaintiffs' claims survive the minimum contacts analysis. At the outset, eight Plaintiffs—Abou-Faycal, Bazzi, Fontaine, Jermany, Khreibani, Rizk, Tleiji, and Zibaoui—are not New Jersey residents. (Am. Compl., ECF No. 3 at ¶¶ 17–21, 23, 25–26). By virtue of their non-resident status, "all the conduct giving rise" to their claims logically occurred outside New Jersey, and therefore cannot support personal jurisdiction in this forum. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 265 (2017). Even though the non-New Jersey Plaintiffs allege the same injury as the resident plaintiffs, the Amended Complaint makes no allegations establishing "a connection between the forum and the specific claims at issue" for the non-New Jersey Plaintiffs. *Id.* at 264–65. The Court therefore lacks personal jurisdiction over the Commercial Banks for the eight non-resident Plaintiffs' claims.[7]

The claims of the two New Jersey resident Plaintiffs, Dr. Najjar and Shami, fare no better. Regardless of the nature of any specific claim, Plaintiffs rely on seven categories of contacts in support of specific personal jurisdiction: alleged solicitations by phone, email, and WhatsApp; account openings using U.S. addresses; transfers of U.S. dollars through U.S. correspondent accounts; continued transmission of account statements; tax reporting to the Internal Revenue Service ("IRS") and delivery of related forms to U.S. addresses; the asserted retention of some

---

[7] Because neither of the New Jersey Plaintiffs is a depositor at Audi, Plaintiffs have not shown a basis for exercising personal jurisdiction over that defendant under the traditional minimum-contacts analysis. In an attempt to keep Audi in the case, Plaintiffs instead invoke a "conspiracy" or "ends of justice" theory. (Pls.' Opp. Br., ECF No. 124 at 19). But that theory still requires that "at least one defendant . . . meets the traditional [minimum] contacts test." *Laurel Gardens, LLC v. McKenna*, 948 F.3d 105, 120 (3d Cir. 2020). As explained below, none of the claims against the remaining Commercial Banks satisfy that standard. The Court therefore lacks personal jurisdiction over Audi under any theory.

funds in U.S. correspondent accounts; and depositor agreements that allegedly permit the banks to sue "anywhere in the world." (Pls.' Opp. Br., ECF No. 124 at 25). None of these contacts, whether considered individually or collectively, establishes sufficient minimum contacts in New Jersey.

Beginning with the communications, Plaintiffs allege that certain bank representatives communicated with Dr. Najjar and Shami while those plaintiffs resided in New Jersey. (Am. Compl., ECF No. 3 at ¶¶ 22, 24). To that end, Dr. Najjar submitted an affidavit asserting, without more, that he was "solicited" by Byblos representatives while in New Jersey. (Najjar Aff., ECF 124-9 at ¶¶ 1–4). Shami also submitted a series of messages between her non-plaintiff husband, Nasser Ani ("Ani"), and representatives at BankMed, Bank of Beirut, and BLOM. (*See* Pls.' Exs. 3–6, ECF Nos. 124-4–7).

But nothing about these allegations establishes anything more than ordinary "informational communications" incidental to an existing banking or contractual relationship that, standing alone, are insufficient to create minimum contacts. *Verotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 152 (3d Cir. 1996). Dr. Najjar's affidavit is entirely conclusory, and the allegations specific to him in the Amended Complaint at most allege that he "inquired" about account withdrawals and was thereafter "offered" raised interest rates by a Byblos representative. (Am. Compl., ECF No. 3 at ¶ 22). As for Shami, the Amended Complaint similarly alleges she was "incentivized" to deposit money while in New Jersey. (*Id.* ¶ 24). Shami's proffered communications show, at most, that her husband, Ani (and not Shami herself) communicated with various bank representatives regarding normal account servicing, including many instances where Ani himself initiated the contact. (*See* ECF No. 124-4 (communications with BankMed where Ani solicits "recommendations and advi[c]e"), 124-5 (Ani asking a BankMed representative to "explain the drop" in a statement), 124-6 (Ani exchanging pleasantries with a Bank of Beirut

16

representative, and coordinating paperwork to be completed in Lebanon), 124-7 (Ani coordinating

BLOM deposits to be made in Lebanon, as well as inquiring about withdrawals and transfers).[8]

These communications show little more than messages being "sent to and from New

Jersey." *Team First Consulting, LLC v. Hangliter*, No. 07-311, 2007 WL 1302440, at *6 (D.N.J.

Apr. 27, 2007). They do not meaningfully demonstrate that the Commercial Banks "deliberately

target[ed] New Jersey." *Newman v. N.C. Ins. Underwriting Ass'n/N.C. Joint Underwriting Ass'n*,

No. 20-1464, 2020 WL 6689756, at *6 (D.N.J. Nov. 13, 2020). At most, they reflect

communications with existing customers who happened to reside here, which is not enough to

establish purposeful availment. *See Siegmeister v. Benford*, No. 15-07099, 2017 WL 2399573, at

*4 (D.N.J. June 1, 2017) ("[C]orrespondence, telephone calls, and emails . . . without more, are

insufficient to hale Defendants into court in New Jersey."); *Eagle Sys., Inc. v. Mod-Pac Corp.*, No.

18-17062, 2019 WL 2536005, at *3 (D.N.J. June 19, 2019) (finding nonresident communications

"to a [resident] plaintiff … insufficient contacts for personal jurisdiction")).

---

[8] The Shami communications Plaintiffs submit suffer from other procedural and substantive defects as well. As a procedural matter, jurisdictional facts must be supported by "sworn affidavits or other competent evidence," *Thomas v. Vinculum Grp. Ltd.*, No. 15-3194, 2015 WL 13504683, at *2 (D.N.J. Dec. 23, 2015), and declarations must be based on personal knowledge, L. CIV. R. 7.2(a). Here, the communications are attached to the declaration of Daniel Cohen, who is not presently counsel of record, and who declares only that he is "familiar with the matters described" within the declaration. (ECF No. 124-1 at ¶ 2). But counsel cannot have personal knowledge of communications to which he was not a party. *See Sunoco, Inc. (R & M) v. MX Wholesale Fuel Corp.*, 565 F. Supp. 2d 572, 576–77 (D.N.J. 2008) (striking attorney certification in part where it was not based on personal knowledge). Substantively, the Court can identify only two communications that could fairly be characterized as solicitations. (*See* Pls.' Ex. 3, ECF No. 124-4 at 3 (transcript of a voicemail left for Ani in which a BankMed representative, apparently communicating with him while he was in Lebanon, proposed "convertible perpetual bond" offerings instead of a withdrawal); Pls.' Ex. 5, ECF No. 124-6 at 3 (messages between Ani and a Bank of Beirut representative, apparently while Ani was abroad, offering a specified interest rate for deposits)). But, as noted, those communications do not involve any plaintiff directly; rather, they are between bank representatives and Ani, Plaintiff Shami's husband. And perhaps even more importantly, because they appear to have occurred while Ani was outside New Jersey, they make an already attenuated connection to this forum weaker.

Plaintiffs' reliance on the fact that some accounts were opened using U.S. addresses fares no better. The use of a customer's U.S. address on account paperwork does not transform a foreign banking relationship into New Jersey-directed conduct. *See Marten v. Godwin*, 499 F.3d 290, 298 (3d Cir. 2007) ("[T]he state of a plaintiff's residence does not on its own create jurisdiction over nonresident defendants.").

The location or use of the Commercial Banks' U.S. correspondent bank accounts also does not support Plaintiffs' assertion of personal jurisdiction in New Jersey. For starters, the Amended Complaint alleges these accounts are based in New York, not New Jersey. (Am. Compl., ECF No. 3 at ¶¶ 48, 90). And even so, New York courts themselves, applying a similar jurisdictional analysis, have recognized "an unbroken line of decisions" holding that Lebanese banks' use of New York correspondent accounts does not establish personal jurisdiction where the claims do not arise from that use. *Kreit v. Byblos Bank S.A.L.*, No. 22-10751, 2023 WL 6977448, at *5–6 (S.D.N.Y. Oct. 22, 2023) (collecting cases); *see also Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 131 (2d Cir. 2022) (finding "no substantial connection between the Commercial Banks' use of their correspondent accounts and the Daous' claims"); *Trans Atl. Imaging, S.A.L. v. Banque MISR Liban S.A.L.*, No. 654432/2020, 2021 WL 2435887, at *2 (N.Y. Sup. Ct. June 15, 2021) (finding "no articulable nexus between such deposits made through defendant bank's correspondent account and either defendant bank's refusal to honor plaintiffs' request to withdraw such funds"); *Malaeb v. Bankmed S.A.L.*, No. 157804/2020, 2021 WL 1925638, at *7 (N.Y. Sup. Ct. May 13, 2021) (finding that "none of plaintiff's three causes of action against each bank defendant rely upon transfers of funds through New York correspondent accounts"). Similarly here, Plaintiffs' claims do not plausibly arise from the Commercial Banks' use of New York-based correspondent bank

18

accounts. The location or use of the correspondent bank accounts therefore fails to support Plaintiffs' assertion of specific personal jurisdiction.

Plaintiffs' remaining asserted contacts are even less persuasive and require only brief discussion. Plaintiffs cite no authority for the proposition that the Commercial Banks' IRS and Foreign Account Tax Compliance Act reporting obligations—conduct directed to Washington, D.C., not New Jersey—can establish minimum contacts with this forum. *See Verotex*, 75 F.3d at 152 (finding "informational communications in furtherance of a contract" insufficient minimum contacts). If accepted, the Commercial Banks would be subject to jurisdiction in every state. Nor do Plaintiffs support their contention that, because the depositor agreements allow the Commercial Banks to sue depositors "anywhere in the world," the Commercial Banks thereby implicitly consented to be sued in the United States, much less in New Jersey. In the end, Plaintiffs have not alleged facts sufficient to establish minimum contacts as to any of the Commercial Banks, let alone claims arising from those contacts.

Finally, the Court concludes that personal jurisdiction is also lacking under *Calder*. To begin, *Calder* applies only to intentional tort claims, *IMO Industries*, 155 F.3d at 261, so it cannot supply jurisdiction for the contract and quasi-contract claims alleged in Counts Four, Six, and Seven. As for the remaining claims, Plaintiffs fail to establish personal jurisdiction under *Calder* because they do not plausibly allege that the Commercial Banks "expressly aimed [their] tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *Id.* at 266.

The Amended Complaint and Plaintiffs' opposition brief offer little developed, nonconclusory support for the proposition that the Commercial Banks expressly aimed any tortious conduct at New Jersey. Plaintiffs argue that the Commercial Banks contacted individuals "by name

19

if they met certain criteria," that the communications were "personalized and persistent," and that the accounts were opened in the customers' individual names. (*See* ECF No. 124 at 35–36). But the communications they rely upon for those conclusory propositions do not bear out that characterization. As noted above, the communications show almost exclusively incidental communications related to the servicing of accounts that happened to occur with individuals who reside in New Jersey. (*See* Pls.' Exs. 3–6, ECF Nos. 124-4–7). That is not enough to show conduct purposefully aimed at New Jersey. *See Walden*, 571 U.S. at 285 ("The plaintiff cannot be the only link between the defendant and the forum. These same principles apply when intentional torts are involved."). There are otherwise no allegations, or other competent evidence presented, that the Commercial Banks engaged in anything more than generalized solicitation of U.S. residents, which similarly does not establish that New Jersey was the focal point of the alleged tortious conduct. *See In re Fragrance Direct Purchaser Antitrust Litig.*, No. 23-2174, 2025 WL 572827, at *7 (D.N.J. Feb. 21, 2025) (citing *Hasson v. FullStory, Inc.*, 114 F.4th 181, 190–91 (3d Cir. 2024)) ("[T]he effects test is not satisfied where the effects of globally targeted conduct are felt in the forum."). Absent forum-specific targeting or other specific contacts with New Jersey, Plaintiffs have not established personal jurisdiction over the Commercial Banks under *Calder*.[9]

In sum, Plaintiffs identify no meaningful forum-directed conduct beyond sporadic communications and incidental account-servicing activity arising from foreign banking relationships centered in Lebanon. They therefore have not established the requisite minimum

---

[9] Because the Court concludes that none of the Commercial Banks are subject to personal jurisdiction under the traditional minimum-contacts analysis, it need not reach Plaintiffs' alternative theories that jurisdiction exists under RICO's civil-conspiracy framework or, to the extent Plaintiffs still press it, conspiracy jurisdiction more generally. *See Laurel Gardens*, 948 F.3d at 120 (explaining that RICO statutory jurisdiction requires "at least one defendant" to satisfy the traditional minimum-contacts test); *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (noting that at least one conspirator must be subject to jurisdiction in the forum).

20

contacts to support personal jurisdiction over their claims against the Commercial Banks. The Commercial Banks' Motion to Dismiss will accordingly be granted for lack of personal jurisdiction.

### 2.  Jurisdictional Discovery is Not Warranted.

Plaintiffs contend that jurisdictional discovery is warranted because their claims are not "clearly frivolous." (Pls.' Opp. Br., ECF No. 124 at 37). To that end, they seek depositions of declarants and account managers; document discovery concerning account-holder files, marketing and contact records relating to U.S. depositors, and tax and regulatory filings; and third-party discovery from auditors and correspondent banks regarding audit issues, reserve practices, and the movement of U.S. funds. (*Id.* at 38–39).

But the Third Circuit has made clear that jurisdictional discovery is not warranted unless "a plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state.'" *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (quoting *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)). Plaintiffs fail to make that showing here. They do not identify with any specificity what additional forum contacts discovery is likely to reveal that would establish minimum contacts as to the Commercial Banks or any good faith basis that discovery would reveal any such minimum contacts. And to the extent Plaintiffs rely on a theory that New Jersey depositors were directly solicited by the Commercial Banks, one would expect Plaintiffs themselves, as the individuals supposedly solicited, to already be in possession of such communications.

The Court will not permit Plaintiffs to conduct "a fishing expedition based only upon bare allegations, under the guise of jurisdictional discovery." *Eurofins Pharma U.S. Holdings v.*

21

*BioAlliance Pharma SA*, 623 F.3d 147, 157 (3d Cir. 2010); *see also Kreit*, 2023 WL 6977448, at *6 (denying plaintiff's request for jurisdictional discovery in a similar case against Byblos); *Daou*, 42 F.4th at 133 n.6 (finding no abuse of discretion in the district court's denial of jurisdictional discovery in a case against Lebanese commercial banks). Plaintiffs' request for jurisdictional discovery will therefore be denied.

****

For all of those reasons, Plaintiffs have not established specific personal jurisdiction over the Commercial Banks. Put simply, Plaintiffs' claims arise from alleged misconduct concerning Lebanese deposit accounts and withdrawal restrictions imposed abroad, not from any conduct meaningfully rooted in or directed at New Jersey. Plaintiffs have also failed to establish that jurisdictional discovery will cure these defects. The Court therefore grants the Commercial Banks' Motion to Dismiss for lack of personal jurisdiction.

**CONCLUSION**

For the foregoing reasons, BDL's Motion to Dismiss, (ECF No. 115), and the Commercial Banks' Motion to Dismiss, (ECF No. 116), are GRANTED without prejudice, and without leave to amend. An appropriate Order accompanies this Opinion.

**CHRISTINE P. O'HEARN**
**United States District Judge**